985 A.2d 513

**Alisa Marie GAUVIN**

v.

**STATE of Maryland.**

**No. 148 Sept.Term, 2008.**

Court of Appeals of Maryland.

Dec. 18, 2009.

William Ray Ford, Camp Springs, MD, for Appellant.

Douglas D. Guidorizzi, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

MURPHY, Judge.

At the conclusion of a bench trial in the Circuit Court for Calvert County, Alisa Marie Gauvin, Appellant, was convicted of driving a motor vehicle while impaired by a controlled dangerous substance, and of possession of phencyclidine (PCP) with intent to distribute. Appellant concedes that the State's evidence was sufficient to establish that she committed those offenses on December 15, 2006, but she argues that she is entitled to a new trial on the "possession with intent" charge. Appellant noted a timely appeal to the Court of Special Appeals, and presented that Court with a single question:

> Did the trial court commit prejudicial error when it permitted an expert witness to state an opinion that the defendant/appellant possessed PCP with an intent to distribute?

Prior to argument before a panel of the Court of Special Appeals, this Court issued a writ of certiorari on its own initiative. 406 Md. 743, 962 A.2d 370 (2008). For the reasons that follow, we hold that the testimony at issue did not violate Md. Rule 5–704(b). We shall therefore affirm the judgments of the Circuit Court.

## Background

Appellant was the driver and sole occupant of an automobile that was stopped about 7:30 p.m. on December 15, 2006 by deputies of the Calvert County Sheriff's Office. A search of the automobile's front passenger compartment turned up (1) two hand-rolled cigarettes, one of which was partially burnt; (2) two eye droppers containing PCP; (3) two glass bottles

containing PCP, (4) a jar containing parsley soaked with PCP, (5) a pair of plastic gloves; and (6) 21 "hand rolling" papers. A search of Appellant's person turned up $240. Appellant was arrested and shortly thereafter subjected to a "drug evaluation" conducted by a "certified Drug Recognition Expert" who testified without objection that, in his opinion, Appellant was "under the combined influence of a dissociative anesthetic and a narcotic analgesic, and ... was unable to operate a vehicle safely at the time of this evaluation."

The State's case included the testimony of First Sergeant Matthew McDonough. When Sgt. McDonough was offered by the State "as an expert in the field of narcotics use, manufacturing, packaging, and methods of distribution," Appellant's trial counsel interposed the following objection:

Your Honor, I'm going to object to him being an expert on the phencyclidine. He has not done it on a prior occasion. This is in fact his first, and I do think that in the field other than phencyclidine, in the packaging and manufacturing I think that he is imminently qualified.

The following transpired after the Circuit Court announced that it would "receive [Sgt. McDonough] as an expert subject to cross examination[:]"

Q   Sergeant McDonough, have you had occasion during the course of this case to review the evidence that was seized by Deputy Gray in connection with the arrest of Ms. Gauvin?

A   Yes, I have.

Q   And have you had the occasion here today to hear the testimony of the witnesses who have come before you today in connection with this matter?

A   Yes, I have.

Q   And based on your review of the evidence that was seized in this case and based upon your observations regarding the testimony of the witnesses here today, do you have the ability to form an opinion as to whether or not the PCP that was seized from Ms. Gauvin on Decem-

ber 15th, 2006 was for her personal consumption or for distribution?

A  Yes, I was able to form an opinion.

Q  And what is that opinion?

A  That the am—

MR. SERIO:  Objection, Your Honor, just for the record.

THE COURT:  Certainly.  Overruled.

MR. SERIO:  Thank you.

[SGT. MCDONOUGH]:  That the amount would indicate to me that it was possessed with intent to distribute.  I would base that on different factors.

According to Sgt. McDonough, (1) a "hand-rolled" cigarette is commonly used to ingest PCP, and (2) the "18 doses" of PCP seized from the vehicle "is kind of [an] unusually large amount for just a user to be driving around with in a vehicle." His direct examination included the following analysis of the tangible evidence:

This is—in my opinion—again, based on just, you know, the 18 doses average of what you would use a cigarette for, the going rate going 15 to 20 dollars per dipper or a cigarette laced or saturated with phencyclidine, the money that was also recovered, the $250 was all in twenties.  There is obviously liquid missing from these vials.  So that would indicate to me that some of it had already been distributed. It's not uncommon for people—the gloves also help add to that opinion because users and people that handle PCP are aware that it is transdermal, that it is absorbed through the skin.  Also people that—it's common also even amongst crack dealers where it's not transdermal where they say they don't leave fingerprints on any of the things that they have handled.  So it serves kind of a dual purpose when you see the rubber gloves there.

Appellant testified as follows.  She was 45 years old and had "been smoking PCP since [she] was 18 years old."  About noon on December 15, 2006, she "committed the crime of being a user;" but she does "not sell PCP."  The PCP seized

by the deputies was for her "personal usage." She and her husband are in the "home services" business, and on the day before she was arrested, she had used the rubber gloves while cleaning a customer's home. At the time of her arrest she was on her way to "the Wal–Mart in Prince Frederick," and had "240 dollars on [her]" because she "was doing a minimum type of Christmas shopping that evening."

When announcing its verdicts, the Circuit Court stated that Appellant's testimony "makes no sense," and that it "finds in looking at the totality of the circumstances that in fact [Appellant] did possess the [PCP] with intent to distribute[.]"

### Discussion

In *Cook v. State,* 84 Md.App. 122, 578 A.2d 283 (1990), *cert. denied, State v. Cook,* 321 Md. 502, 583 A.2d 276 (1991), while holding that a police officer should have been prohibited from, "in effect, stating an opinion that both [appellant Martin Cook and appellant William Darby] were guilty of all charges: as members of an organization using the house in which they were found for the distribution of the cocaine that was in the house," and noting that "[c]ases in other jurisdictions have allowed expert opinion testimony that comes very close to an opinion of the defendant's guilt, particularly in prosecutions for violations of controlled dangers substances laws," the Court of Special Appeals stated:

> We do not believe that there is any need for a hard and fast rule for the acceptance or rejection of expert opinion evidence as to ultimate facts that may tend to encroach upon the jury's function to determine guilt or innocence, or the credibility of witnesses, or to resolve contested facts. In each case, the court must decide whether the prejudice to the defendant will outweigh the usefulness to the jury of the opinion sought to be elicited from the expert. That may well depend upon the subject matter under discussion. Some matters may be within the understanding of the average person and the jury might not require the expert's opinion. Or the expert may testify that a certain pattern of conduct or the presence of certain factors is often found in a

particular criminal enterprise, leaving it to the jury to apply that expertise to the facts of the case. As to some matters, on the other hand, it may be necessary for the expert to express his opinion on the ultimate fact in issue in such a manner as to come close to an encroachment on the jury's function to resolve contested facts in order for the jury to get the benefit of the expert's knowledge, where such knowledge is necessary for an understanding of the facts and cannot reasonably be imparted in a less prejudicial manner.

*Id.* at 142, 578 A.2d at 293. Maryland Rule 5–704(b), however, like the Federal Rule of Evidence from which it is derived, establishes "a line that expert witnesses may not cross." *United States v. Mitchell,* 996 F.2d 419, 422 (D.C.Cir.1993).

When the Federal Rules of Evidence (FRE) were enacted in 1974, FRE 704 provided:

### OPINION ON ULTIMATE ISSUE

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

In 1984, as part of the Insanity Defense Reform Act, Congress amended FRE 704, which now provides:

### OPINION ON ULTIMATE ISSUE

**(a)** Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

**(b)** No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Although it is clear from the legislative history that FRE 704 was amended to restrict expert testimony relating to the sanity of a criminal defendant, Professors Mueller and Kirkpatrick have noted that FRE 704(b) is not restricted to expert testimony on the issue of sanity:

[FRE 704(b)] applies to testimony on all mental conditions in the defendant that amount to elements in the charged crimes or defenses. Thus it bars expert testimony that defendant had or did not have criminal intent that is an element in the offense, or had or did not have the mental state required for defenses like duress, intoxication, extreme emotional disturbance, or entrapment where predisposition is a central issue.

Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence,* § 7.13 at 668–69 (4th ed. 2009) (footnotes omitted).

When this Court adopted the Maryland Rules of Evidence in 1993, we included MRE 5–704, § (a) of which is identical to FRE 704(a), and § (b) of which includes all of FRE 704(b), but also provides: "This exception does not apply to an ultimate issue of criminal responsibility." Although we have made no changes to this rule since we adopted it, we did not adopt the version of MRE 5–704 that was initially proposed by the Rules Committee. When the proposed Rules of Evidence were submitted to this Court in the One Hundred Twenty–Fifth Report of the Rules Committee, proposed Rule 5–704 provided:

### OPINION ON ULTIMATE ISSUE

Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

The REPORTER'S NOTE to this proposed Rule contains the following explanation for the decision to recommend that section (b) of FRE 704 not be included in MRE 5–704:

F.R.Ev. 704 was amended in 1984 following the trial of John Hinckley for the attempted assassination of then-President Reagan. New section (b) provided, "No expert

witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

Section (b) of F.R.Ev. 704 is omitted from proposed Rule 5–704 for two reasons. First, Rule 704(b) is roughly the equivalent of the current state of Maryland law regarding the admissibility of expert opinion on the mental state or condition of a criminal defendant at the time of the commission of the crime. Second, Rule 704(b) differs from the law in Maryland regarding expert testimony on the issue of criminal responsibility.

As to the first reason, Maryland courts have consistently rejected arguments that a psychiatrist or psychologist be permitted to testify that a defendant was unable to form the specific intent to commit a crime. *Cirincione v. State*, 75 Md.App. 166, 540 A.2d 1151 (1988). *See also Simmons v. State*, 313 Md. 33, 47–48, 542 A.2d 1258 (1988).

During an October 4, 1993 open hearing on the One Hundred Twenty–Fifth Report, this Court requested that the Committee respond to a number of questions, including the question of whether MRE 5–704 should expressly preclude an opinion as to the defendant's specific intent. In a letter dated October 29, 1993, the Committee stated:

Although there did not appear to be any sentiment for including § (b) of FRE 704 to preclude an ultimate opinion as to criminal responsibility, a question was raised whether comparable language was necessary to preclude an opinion as to a required specific intent. In that regard, the Court might consider a § (b) as follows:

"(b) An expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may not state an opinion or inference as to whether the defendant had a mental state or condition constituting an element of the crime charged. That issue is for the trier

of [fact] alone. This exception does not apply to an ultimate issue of criminal responsibility."

If the Court opts for a provision such as this, a Committee Note should be added to make clear the distinction between the Maryland Rule and the Federal. The Court might consider the following:

"Committee Note: Section (b) of this Rule is substantively different from F.R.Ev. 704(b). The Federal provision precludes an opinion on the ultimate issue of criminal responsibility, i.e., sanity. The Maryland Rule does not preclude such an opinion. It does, however, preclude an opinion as to whether the defendant had a required intent or mental state where that intent or state is an element of the offense. *See Hartless v. State,* 327 Md. 558[, 611 A.2d 581] (1992)."

At an open hearing on November 18, 1993, this Court adopted the present rule and approved the proposed Committee Note.

In *Hartless,* while affirming convictions for murder and related offenses, and rejecting the contention "that the trial court erroneously excluded the ... opinion [of the defendant/petitioner's psychiatrist] with respect to the defendant's state of mind at the time of the offense," this Court stated:

[T]he opinion of [the defendant's psychiatrist] concerning the defendant's actual intent at the time of the offense was properly excluded. As this Court made clear in *Simmons v. State,* 313 Md. 33, 48, 542 A.2d 1258 (1988), and in *Johnson v. State,* 303 Md. 487, 515, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986), psychiatrists have not been shown to have the ability to precisely reconstruct the emotions of a person at a specific time, and thus ordinarily are not competent to express an opinion as to the belief or intent which a person in fact harbored at a particular time. *See also Globe Security Systems v. Sterling,* 79 Md.App. 303, 307–08, 556 A.2d 731 (1989).

*Id.* at 572–73, 611 A.2d at 588.

Neither *Hartless* nor MRE 5–704(b) are inconsistent with cases interpreting FRE 704(b) in which the courts have drawn

the critical distinction between (1) an explicitly stated opinion that the criminal defendant had a particular mental state, and (2) an explanation of why an item of evidence is consistent with a particular mental state. As Professors Mueller and Kirkpatrick have explained:

> Expert testimony at one remove from such ultimate issues as intent may be admitted even though it indirectly supports a conclusion or suggests an inference on some ultimate issue. Thus testimony describing typical patterns of organized crimes or conspiracies does not violate FRE 704(b) even though it provides evidence that persuades a jury, in light of what defendant and others are shown to have done, that the requisite intent existed.

Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence*, § 7.13 at 670 (4th ed. 2009) (footnotes omitted).

The cases with which we agree include *United States v. Lipscomb*, 14 F.3d 1236 (7th Cir.1994), and *United States v. Gonzales*, 307 F.3d 906 (9th Cir.2002). In *Lipscomb*, while affirming drug-trafficking and related offenses based in part on the testimony of three law enforcement officers who opined that cocaine seized from the appellant's person was "for street level distribution," the United States Court of Appeals for the Seventh Circuit concluded that FRE 704(b) does not operate to exclude expert testimony that a certain pattern of conduct is consistent with criminal activity:

> [W]e conclude that when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, thought not determinative, is the degree to which the expert refers specifically to the "intent" of the defendant, ... for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes.

In this case, each of the challenged opinions was immediately followed by a precise explanation of the grounds for the opinion, and the grounds cited made it clear that the officers were relying on their knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of Lipscomb's mind.

*Id.* at 1242–43 (citations and footnotes omitted).

In *Gonzales*, while affirming firearm and drug trafficking convictions, the United States Court of Appeals for the Ninth Circuit rejected the argument that "the district court erred in admitting expert testimony on Gonzales's mental state[.]" *Id.* at 908. The government's case against Gonzales included the testimony of a DEA Special Agent who was qualified as an expert in drug distribution and possession. During his testimony, the agent "was asked whether the particular amount of drugs found on a person indicated whether such an individual possessed the drugs for personal use or for distribution." *Id.* at 911. The appellate court explained why the agent's answer to this question did not violate FRE 704(b):

[The Special Agent] testified that "my opinion would be that based upon the weight [of the drugs seized], that [sic] indeed it would be used to distribute as opposed to possess for your own ingestion." [The Special Agent] was asked whether his opinion would be firmer or less firm if the person carrying the drugs was also carrying a gun, pay/owe sheets and a scale. He responded, "Well, those circumstances would lead me to believe and make my opinion extremely firm that that person was carrying those items for the purpose of distributing the drugs."

\* \* \*

In *United States v. Morales*, 108 F.3d 1031, 1035–36 (9th Cir.1997) (en banc), we held ... "[a] prohibited 'opinion or inference' under Rule 704(b) is testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *Id.* at 1037. In *Morales*, we upheld the admissibility of the expert testimony at issue because—although "the prosecu-

tion presented the testimony hoping the jury would infer the requisite mens rea—the defendant's intent to distribute . . . the testimony did not compel that inference." *Id.* at 1038.

\* \* \*

It is sometimes difficult to distinguish between an expert opinion that would necessarily lead to the finding of a particular intent and an opinion that only comes close to this forbidden effect. For example, an opinion by a polygraph examiner that a defendant was lying when the defendant stated in the course of polygraph testing that he did not have a requisite mens rea is inadmissible under Rule 704(b) because, if the jury believed the expert opinion, it would necessarily find intent. *See United States v. Campos*, 217 F.3d 707 (9th Cir.2000) (so holding). That is not the case here. [The Special Agent] never directly and unequivocally testified to Gonzales's mental state; he never stated directly that Gonzales had the intent to distribute. Rather, he indicated his firm conviction that a "person" possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing. Even if the jury believed the expert's testimony, the jury could have concluded that Gonzales was not a typical or representative person, who possessed the drugs and drug paraphernalia involved. In other words, it could be concluded that, although a typical person might have had the requisite purpose or intent, Gonzales was atypical and did not.

*Id.* at 911–12.

▬▬ Although it is often stated that trial judges have wide discretion to admit or exclude items of evidence, a trial judge does not have discretion to make an erroneous ruling that results in the admission of incompetent and unfairly prejudicial expert testimony. *Bohnert v. State*, 312 Md. 266, 279, 539 A.2d 657, 663 (1988). In the case at bar, it is clear that the prosecutor's question—"whether or not the PCP that was seized from [Appellant] was for her personal consumption or for distribution?"—sought an opinion that is prohibited by

MRE 5–704(b). The Circuit Court should have sustained the objection to this question on the ground that no expert is entitled to express the opinion that the defendant possessed a controlled dangerous substance with the intent to distribute it. Sgt. McDonough, however, never expressed an opinion that "crossed the line" established by MRE 5–704(b). As was the situation in *Gonzales, supra,* Sgt. McDonough "never directly and unequivocally testified to [Appellant's] mental state; he never stated directly that [Appellant] had the intent to distribute." 307 F.3d at 911. As was the situation in *Lipscomb, supra,* Sgt. McDonough's opinion was based upon his "knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of [Appellant's] mind." 14 F.3d at 1243. No unfair prejudice occurs when an erroneous evidentiary ruling results in the introduction of *admissible* evidence. *Ali v. State,* 314 Md. 295, 309, 550 A.2d 925, 931–32 (1988).

In *Ali,* while affirming convictions for murder and related offenses, this Court rejected the contention that a physician should not have been permitted to testify about the side effects of the drugs that he had administered to the State's key witness, while that witness was recovering from near fatal injuries inflicted by the defendant and his accomplices. In that case, the State's key witness was impeached with evidence that, while hospitalized after escaping from the perpetrators, she had said some "bizarre things" and had made several statements that were inconsistent with her trial testimony. When the witness's treating physician was called during the State's case-in-rebuttal, the Circuit Court ruled that "[h]e's only going to be permitted to say the probable effect of the drugs that the record shows she was administered at that particular time." The record shows that the following transpired during the physician's direct examination:

Prosecutor: Do you have an opinion within a reasonable degree of medical certainty as to what, if any, side effects the two drugs being given together in those dosages at those times would have on Mrs. [ ]?

[Doctor]: Yes, I do.

Prosecutor: Could you give us that please, Doctor?

[Doctor]: There are multiple potential side effects to these drugs. One is nausea and vomiting. The second is respiratory depression. Third is increased sleepiness or drowsiness. And fourth is a lack of complete ability to respond coherently to questions.

Defense Counsel: Objection.

The Court: Overruled.

This Court explained why the appellant was not entitled to a new trial on the ground that the prosecutor asked an improper question:

We conclude that the prosecutor had a right to present evidence from this expert concerning the known side effects of specific drugs given in the doses and at the time shown by the record to a person of the height, age, weight, and known medical condition of [the witness]. **The prosecutor's last question strayed from the track established by the court. The doctor's answer did not. The objection to the answer was properly overruled.**

The State was not attempting to establish by the doctor's testimony alone that [the witness] was disoriented when she spoke to Officer Ash during the first three days of her hospitalization. [The witness] had already testified to that fact. At that point, the jury had at least two obvious options concerning the inconsistencies in [the witness's] statements: 1) she was lying, or 2) her ability to accurately recount the details of the event was adversely affected by the medication she had been given. The State was offering the testimony of an expert to show that these drugs *could,* and were known to, cause this effect upon a person such as [the witness]. This information was relevant, and potentially useful to the jury. A juror attempting to determine whether [the witness] was telling the truth when she said she was disoriented or "in and out of it" because of medication would obviously benefit from knowing as a scientific fact whether that medication could, or often did, produce

such an effect. Proof that the medication was known to diminish the ability to respond coherently to questions was therefore relevant and admissible.

The prosecutor's final question went off track because he asked what side effects the drugs would have had on [the witness], rather than asking what side effects were known with reasonable probability to occur to a person such as [the witness]. The doctor did not respond directly to the question, but answered only by stating that there are multiple side effects to the drugs, and naming four such side effects. **The doctor's answer was entirely proper, and within the correct guidelines established by the trial judge. Notwithstanding the wording of the prosecutor's question, the answer did not suggest that the doctor was giving an opinion that [the witness] had in fact suffered any of the known side effects** . . . . The trial judge did not err in any of his rulings on this evidentiary question.

*Id.* at 309–10, 550 A.2d at 931–32. (Emphasis added).

As was the situation in *Ali*, although the prosecutor's question "strayed from the track" established by MRE 5–704(b), Sgt. McDonough's "answer did not." Under these circumstances, Appellant is not entitled to a new trial on the ground that Sgt. McDonough expressed an opinion that should have been excluded under Md. Rule 5–704(b).

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**

BELL, C.J., and GREENE, J., dissent.

Dissenting Opinion by BELL, C.J., which GREENE, J., joins.

Alisa Marie Gauvin, the petitioner, on December 15, 2006, was arrested by Calvert County police officers after they observed her driving a Cadillac, which they earlier had noticed parked, with the engine running and headlights on, in what seemed to the officers to be an unusual location. She initially was charged with driving under the influence of alcohol and/or

drugs, to which, later, were added possession of PCP in sufficient quantity to indicate an intent to distribute, possession of PCP, and possession with intent to use drug paraphernalia. When she was arrested, she was observed to be disorientated, and slurring her speech, and a "chemical odor emitting from the vehicle" was detected. A search of the vehicle incident to the arrest resulted in the discovery of two clear glass bottles totaling approximately eighteen milliliters of liquid phencyclidine (PCP), a jar containing four-tenths of a gram of parsley saturated with PCP, a hand rolled cigarette weighing one-tenth of a gram also saturated with PCP, one pair of rubber gloves, three eye droppers, and cigarette rolling paper. From the petitioner's person, the officer seized two-hundred and forty dollars ($240).

During her bench trial, the State called First Sergeant Matthew McDonough ("Sgt. McDonough") to testify as an "expert in the field of narcotics use, manufacturing, packaging, and methods of distribution." The following colloquy occurred during his testimony:

"[THE PROSECUTOR]: Sergeant McDonough, have you had occasion during the course of this case to review the evidence that was seized by Deputy Gray in connection with the arrest of Ms. Gauvin?

"[SGT. MCDONOUGH]: Yes, I have.

"[THE PROSECUTOR]: And have you had the occasion here today to hear the testimony of the witness[es] who have come before you today in connection with this matter?

"[SGT. MCDONOUGH]: Yes, I have.

"[THE PROSECUTOR]: And based upon your review of the evidence that was seized in this case and based upon your observations regarding the testimony of the witnesses here today, do you have the ability to form an opinion as to whether or not the PCP that was seized from Ms. Gauvin on December 15, 2006 was for her personal consumption or for distribution.

"[SGT. MCDONOUGH]: Yes, I was able to form an opinion.

"[THE PROSECUTOR]: And what is that opinion?

"[SGT. MCDONOUGH]: That the am—

"[DEFENSE COUNSEL]: Objection, Your Honor, just for the record.

"[THE COURT]: Certainly. Overruled.

"[DEFENSE COUNSEL]: Thank you.

"[MCDONOUGH]: That the amount would indicate to me that it was possessed with intent to distribute. I would base that on different factors."

Asked to "explain [his] conclusion to the court" and the "factors used in reaching that opinion," Sgt. McDonough testified that it is "common" for people to use a dipper and eye dropper to transfer liquid PCP to "hand-rolled" cigarettes for the purposes of ingestion and that the "four tenths of a gram" found in petitioner's vehicle

"would average out to four hand-rolled cigarettes if you are going to break it down that way. . . . So you are looking at 18 doses or 18 cigarettes on top of the possibility of four parsley cigarettes, depending on how widely they were done up . . . ."

Sgt. McDonough also testified the "going rate" or street value "per dipper or a cigarette laced or saturated with phencyclidine" was "15 to 20 dollars." From the $240 found on petitioner's person "all in twenties" and the "liquid missing from the[ ] vials," Sgt. McDonough deduced "some of it had already been distributed." Sgt. McDonough concluded:

"[SGT. MCDONOUGH]: . . . I find that this is kind of a unusually large amount for a user to be driving around with in a vehicle. Typically when I either made arrests or made contact with other officers that have made arrests for phencyclidine, that may have one or two cigarettes which have already been saturated[.] . . . This is—this much

PCP based on my training and experience would not be used in a single evening or even a two day usage."

The petitioner was convicted of possession of PCP with intent to distribute, for which she was sentenced to ten years imprisonment. She noted an appeal to the Court of Special Appeals, challenging, as to that conviction, the admission of Sgt. McDonough's expert testimony.

## I. Legal Analysis

At issue in this case is the application and, perhaps, the viability, of Maryland Evidence Rule 5–704(b). Although the majority acknowledges, and even holds, that the question elicited the witness' opinion with regard to the petitioner's intent in possessing the controlled dangerous substance and paraphernalia, it gives no effect or weight to that holding. Instead, it focuses only on the answers given by the witness, concluding from them alone that the witness did not opine on the petitioner's intent. *Gauvin v. State,* 411 Md. 698, 713, 985 A.2d 513, 522 (2009). The majority reasons that, notwithstanding that the testimonial question expressly naming the petitioner, because the witness's response did not, that response is to be construed as a more general response and not as one made with direct reference to the petitioner or to the petitioner's criminal intent. *Id.* at, 710–11, 985 A.2d at 520. By separating—independently considering—an improper testimonial question concerning the petitioner's criminal intent from the witness's answer, the majority permits a witness to speculate as to a criminal defendant's mental state and, worse yet, declares it to be admissible. In so doing, it evades the express language of Rule 5–704(b), in effect rendering it essentially meaningless. I do not agree and, so, shall dissent. There are two reasons. First, the majority's holding directly contravenes the express language of Rule 5–704(b), which excludes from evidence an opinion by an expert witness regarding the mental state of a criminal defendant. Second, and in any event, a court cannot isolate a witness's response from

the testimonial question which prompted the response in the first place.

*A. The Use of Federal Rules of Evidence 704 is improper in this case.*

Maryland Rule 5–704 [1], Opinion on Ultimate Issue, and not Federal Rule of Evidence 704 [2] governs this case. The history of the Rule and the Rule itself make this clear. Following the adoption of FRE 704, there was discussion in Maryland about taking existing evidence based rules and the caselaw that had been developed and codifying both into one set of Maryland Rules, to be found at Title 5 of the Rules. Unwilling simply to duplicate the Federal Rules, the Court of Appeals carefully considered each rule drafted by the Maryland Standing Committee on Rules of Practice and Procedure separately to ensure that each Maryland Rule was consistent with existing Maryland law. Initially, as proposed by the One Hundred Twenty–Fifth Report, Rule 5–704 read:

"Rule 5–704. Opinion On Ultimate Issue

---

1. Maryland Rule 5–704 provides:
   "(a) In general. Except as provided in section (b) of this Rule, testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.
   "(b) Opinion on mental state or condition. An expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may not state an opinion or inference as to whether the defendant had a mental state or condition constituting an element of the crime charged. That issue is for the trier of fact alone. This exception does not apply to an ultimate issue of criminal responsibility."

2. Federal Rule of Evidence 704. Opinion on Ultimate Issue
   "(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
   "(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact."

During the October 4, 1993 presentation of the Rule, the Honorable Alan Wilner [3] expressed his concern that, in an attempt to separate this rule from FRE 704, perhaps the Committee had "gone too far." Acknowledging the Court's sentiment that Maryland law in this area was not akin to the Federal law and believing that there were aspects of Maryland law that still should be encapsulated by the final version of Rule 5–704, he submitted a letter to the court, dated October 29, 1993, which read:

"Although there did not appear to be any sentiment for including § (b) of the FRE 704 to preclude an ultimate opinion as to criminal responsibility, a question has been raised whether comparable language was necessary to preclude an opinion as to a required specific intent. In that regard, the Court might consider a § (b) as follows

'(b) An expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may not state an opinion or inference as to whether the defendant had a mental state or condition constituting an element of the crime charged. That issue is for the trier of fact alone. This exception does not apply to an ultimate issue of criminal responsibility.'

"If the Court opts for a provision such as this, a Committee Note should be added to make clear the distinction between the Maryland Rule and the Federal. The Court might consider the following:

'Committee Note: Section (b) of this Rule is substantively different than FRE 704(b). The Federal provision precludes an opinion on the ultimate issue of criminal responsibility, i.e., sanity. The Maryland Rule does not preclude such an opinion. It does, however, preclude an opinion as

---

**3.** Honorable Alan Wilner who was then sitting on the Court of Special Appeals, and was serving as Chair of Court of Appeals Standing Committee on Rules of Practice and Procedure.

to whether the defendant had a required intent or mental state where that intent or state is an element of the offense. See *Hartless v. State,* 327 Md. 558, 611 A.2d 581 (1992).' "

At the open hearing, on November 18, 1993 the Court approved and adopted this version of Rule 5–704, in addition to the Committee note.

Section (a) of Rule 5–704 sets out the general rule for expert witness testimony, permitting an expert witness to state his or her opinion even if it relates to the "ultimate issue to be decided by the trier of fact," the jury in a jury trial, the trial judge in a bench trial. Section (b) of Md. Rule 5–704, however, is an exception to that general rule. Although, as originally adopted, it did not expressly provide that section (b) was an exception to section (a), the Court, on recommendation of the Rules Committee, clarified the relationship between section (a) and section (b) in the 1995 amendment of the Rule by adding the underscored language:

"(a) In general. Except as provided in section (b) of this Rule, testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact."

The minutes from the Rules Committee meeting of April 8, 1994 reflect:

"The Chairman explained that the reason this added language was not there originally is because the Rule as drafted by the Rules Committee did not contain section (b) which was later added by the Court of Appeals. There was no discussion about this issue so the change was approved by the Committee."

The "Source" note for the Rule also states, "Section (a) of this Rule is derived from FRE 704(a). Section (b) is new."

There can be no doubt that, in adopting section (b) of Md. Rule 5–704, this Court unequivocally meant the Maryland Rule to be different from the Federal Rule. The history of section (b) of the Maryland Rule, therefore, was never intend-

ed to be compared to FRE 704. Nevertheless, the majority states:

> "Neither *Hartless* nor MRE 5–704(b) are inconsistent with cases interpreting FRE 704(b) in which the courts have drawn the critical distinction between (1) an explicitly stated opinion that the criminal defendant had a particular mental state, and (2) an explanation of why an item of evidence is consistent with a particular mental state."

*Gauvin*, 411 Md. at 707–08, 985 A.2d at 518. The majority, citing only legal authority focused on, applying and interpreting FRE 704, proceeds without another mention of the Maryland Rule until it states its holding. *Gauvin*, 411 Md. at 707–11, 985 A.2d at 518–20. On the basis of Rule 704(b) and those authorities, it concludes that "although the prosecutor's question 'strayed from the track' established by MRE 5–704(b), Sgt. McDonough's 'answer did not[ ],' " *Gauvin*, 411 Md. at 713, 985 A.2d at 522, because it did not "cross[ ] the line established by MRE 5–704(b)." *Gauvin*, 411 Md. at 711, 985 A.2d at 520. The majority, thus, by this holding, has disregarded Rule 5–704(b) and its specific language, with which it is irreconcilable, to attain a result that only could be reached by following FRE 704(b).

There is no doubt that the majority absolutely relies on the Federal Rule and utterly disregards the Maryland Rule. In doing so, however, the majority overlooks its own historical recitation and the Rules Committee Note, which comments directly on the relationship between Md. Rule 5–704(b) and the FRE 704. Indeed, the analysis by the majority provides a hasty, though surreptitious, abandonment of the Maryland Rule in favor of, and so that it could draw parallels to, the Federal Rule and the case law interpreting and applying it.

To be sure, where the "determination involves a question of federal constitutional law," *Bd. of Educ. v. Zimmer–Rubert*, 409 Md. 200, 214, 973 A.2d 233, 241 (2009), or the Maryland and Federal Rules are identical, *Washington v. State*, 406 Md. 642, 651, 961 A.2d 1110, 1115 (2008), our inquiry is not limited to consideration of the Maryland Rule to the exclusion of the

federal rule. Where, however, a Maryland Rule expressly differs from the Federal Rule, this Court has not relied on that Federal Rule and the case law interpreting it to inform the meaning of the Maryland Rule. *Greco v. State,* 347 Md. 423, 434, 438, 701 A.2d 419, 424, 426 (1997) (analyzing Rule 4–345(b), the predecessor to Rule 4–345(e), in juxtaposition to Federal Rule of Criminal Procedure 35(b), and noting that, despite similarities in the language between the two rules, "there are significant differences between the current Maryland rule and its federal counterpart," such that the Federal Rule and accompanying "federal decisions do not embody the appropriate rationale for interpreting [the] Maryland rule."), *see also Fuller v. State,* 397 Md. 372, 380, n. 6, 918 A.2d 453, 458, n. 6 (2007). Maryland Courts are bound by Maryland law, in this case, the Maryland Rules, unless there is a clear indication that the applicable Maryland Rule is interchangeable with its federal counterpart. This case does not present such a situation. Maryland Rule 5–704, therefore, controls the outcome of this case.

Accordingly, the majority's reliance on cases, such as *United States v. Lipscomb,* 14 F.3d 1236 (7th Cir.1994) and *United States v. Gonzales,* 307 F.3d 906 (9th Cir.2002), that interpret the federal counterpart to Maryland Rule 5–704(b), is misplaced. In *Lipscomb,* the defendant was arrested after he fled a stolen car at the close of a police chase. 14 F.3d 1236, 1237–1238. During the search of his person incident to the arrest, police officers recovered one revolver, six bullets, $404 in cash, and 4.2. grams of cocaine. *Id.* at 1238. Lipscomb was found guilty of possession of a firearm by a person previously convicted of a felony, one count of using and carrying a firearm in relation to the commission of a drug-trafficking crime and one count of possession of cocaine with intent to distribute. *Id.* at 1238–1239.

On appeal, the United States Court of Appeals for the Seventh Circuit applied FRE 704 when considering whether the "district court erred in permitting the officers to give their expert opinions of whether the cocaine they found on him was for distribution rather than for his personal use." *Id.* at 1239.

Relying on the 1984 Senate Report which introduced FRE 704, the court determined that section (b) of the rule was not intended to apply to expert law enforcement testimony. *Id.* at 1241. It stated:

> "Thus, it is evident that Rule 704(b) was designed to avoid the confusion and illogic of translating the "medical concepts" relied upon by "psychiatrists and other mental health experts" into legal conclusions.

> "That limited purpose, furthermore, is reflected in the language of the rule. The rule does not purport to apply to every expert witness; instead, its first phrase restricts its application to experts "testifying with respect to the mental state or condition" of a criminal defendant.

> \* \* \*

> "And so the most sensible way to read it, in light of its terms and the purpose of the rule, is as referring to testimony based on a "psychiatric" or similar "medical" analysis of the defendant's mental processes. *See United States v. Richard*, 969 F.2d 849, 855 n. 6 (10th Cir.), *cert. denied*, 506 U.S. 887, 113 S.Ct. 248, 121 L.Ed.2d 181 (1992) (suggesting, without deciding, that Rule 704(b), should be confined to such testimony).

> "The expert law enforcement testimony at issue in this case did not, of course, depend on any such analysis. Nor did the testimony present the kind of danger Rule 704(b) was designed to avoid. The Senate and House reports quoted above indicate that the danger associated with mental health testimony is that the expert, who is qualified only to explain medical concepts, will be called upon to interpret legal ones. No similar danger arises from the testimony of law enforcement experts because, by definition, they are qualified to identify illegal behavior and to distinguish among its various forms. It is no stretch, then, for a law enforcement expert to say that a certain pattern of conduct evinces a particular kind of criminal activity. On the contrary, such testimony is considered quite helpful in drug-trafficking cases."

*Id.* at 1241–1242. Although the court seemed certain it could resolve the question before it "without reference to Rule 704(b)" it did feel the need to square its holding with the inconsistent application of the Rule in its own court and sister federal circuits. *Id.* at 1242. In doing so, it held:

> "To reconcile that fact with our impression, discussed above, that the rule is of more limited scope, we conclude that when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically to the "intent" of the defendant, *see* [*U.S. v.*] *Brown,* 7 F.3d [648] at 653 n. 2, for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes."

*Id.* at 1242–1243.

The *Lipscomb* court's discussion of the background of the Federal Rule further clarifies why the Md. Rule is "substantively different." The Committee Note for Rule 5–704 specifically discusses the distinction between the federal and Maryland rules that the *Lipscomb* court highlights.

> "The Federal provision precludes an opinion on the ultimate issue of criminal responsibility, i.e., sanity. The Maryland Rule does not preclude such an opinion. It does, however, preclude an opinion as to whether the defendant had a required intent or mental state where that intent or state is an element of the offense."

Cases which apply the Federal Rules cannot therefore inform this Court on application of the Maryland Rules.

Notably, even under *Lipscomb's* narrow application of FRE 704 regarding expert law enforcement testimony, the testimony of Sgt. McDonough still is inadmissible under the Maryland

Rule. The *Lipscomb* court states that it and other courts have looked at the use of "magic words," such as the witness's specific mention of "intent" to "trigger[ ][the] application of the rule." *Lipscomb,* 14 F.3d at 1240. Although the court states that the use of the word "intent" is not dispositive, it notes the word is nevertheless a strong indicator that the "limited scope" of the rule has been violated and that the opinion offered was "based on some special knowledge of the defendant's mental process." *Id.* at 1242. During his testimony, Sgt. McDonough used the trigger words the *Lipscomb* court states are "strong indicator[s]" that the rule has been violated. Thus, while *Lipscomb's* analysis of the federal rule is not dispositive in this case, even under its analysis, the majority holding that the answer is not violative of the rule cannot be supported.

The majority also relies on *United States v. Gonzales,* 307 F.3d 906 (9th Cir.2002). In *Gonzales,* the defendant initially was arrested and charged by a plain clothes officer who witnessed him and "another individual engaged in a possible narcotics transaction." *Id.* at 908. After he failed to appear for a court hearing, he was arrested again. On this occasion, a search of his person uncovered drugs and $243 in cash, *id.,* and the inventory of a backpack that Gonzales possessed revealed a gun, drugs, and drug paraphernalia. *Id.* It was determined that Gonzales possessed the drugs with intent to distribute, *id.* at 909, of which, in addition to being a felon in possession of a firearm and ammunition and carrying a firearm during a drug trafficking crime, *id.* at 908, Gonzales was convicted. On appeal, Gonzales argued that "the district court erred in admitting expert testimony on Gonzales's mental state." *Id.*

The court, the majority points out, *Gauvin,* 411 Md. at 708–09, 985 A.2d at 519, rejected that argument. With regard to its explanation of "why the agent's answer to [the prosecutor's] question did not violate FRE 704(b)," the special agent, the court said:

"never directly and unequivocally testified to Gonzales's mental state; he never stated directly that Gonzales had the

intent to distribute. Rather, he indicated his firm conviction that a 'person' possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing. Even if the jury believed the expert's testimony, the jury could have concluded that Gonzales was not a typical or representative person, who possessed the drugs and drug paraphernalia involved."

*Gauvin,* 411 Md. at 711, 985 A.2d at 520 (quoting *Gonzales,* 307 F.3d at 911–912). In this case, Sgt. McDonough stated "[t]hat the amount would indicate to me that it was possess[ed] with intent to distribute." Unlike the factual situation in *Gonzales,* Sgt. McDonough makes no reference to whether "a typical or representative person" in possession of that amount of drugs would possess the drugs for personal consumption or distribution. Without a general reference to Sgt. McDonough's professional background or to what is consistent with "a typical or representative person" the jury in this case, contrary to *Gonzales,* could not have made the decision whether the petitioner was atypical. Moreover, because the Federal Rules are not controlling, the holding in *Gonzales* is not dispositive. If this Court, however, turned to *Gonzales* for guidance, my position would remain the same because Sgt. McDonough's testimony did not generally refer to what is consistent with his professional background, but instead was specific to what he speculated the petitioner's mental state to be. This is inadmissible testimony pursuant to Md. Rule 5–704(b).

*B. A testimonial question for purposes of review cannot be divorced from the answer given.*

The majority relies on *Ali v. State,* 314 Md. 295, 550 A.2d 925 (1988) for the proposition that when a court is reviewing whether testimony was properly admitted, the question may be considered separate from the answer given. The majority states:

"As was the situation in *Ali,* although the prosecutor's question 'strayed from the track' established by MRE 5–704(b), Sgt. McDonough's 'answer did not.' Under these

circumstances, Appellant is not entitled to a new trial on the ground that Sgt. McDonough expressed an opinion that should have been excluded under Md. Rule 5–704(b)."

*Gauvin*, 411 Md. at 713, 985 A.2d at 522. *Ali* predates the promulgation of Rule 5–704(b). *See Mayor of Oakland v. Mayor of Mt. Lake Park*, 392 Md. 301, 317, 896 A.2d 1036, 1046 (2006) ("The cases relied upon by respondent, with the exception of *Pumphrey v. Stockett*, 187 Md. 318, 49 A.2d 804 (1946), all predate the enactment of Art. 1 § 36 and are no longer persuasive."); *see also Montgomery County Bd. of Educ. v. Horace Mann Ins.*, 383 Md. 527, 545, 860 A.2d 909, 919 (2004) ("It would be wholly inconsistent·with our case law—case law that predates the enactment of the statutes now contained in §§ 4–104(d) and 4–105 and that was therefore presumably known to the Legislature when they enacted those statutes—to construe § 4–105 as allowing the board to make its own unreviewable decision whether a potentiality of coverage exists in any given case. That being so, it would be absurd to construe § 4–104(d), enacted to make explicit the duty to defend that was implicit in § 4–105, to achieve that inconsistent result."); *Woodfield v. W. River Improvement Ass'n*, 165 Md.App. 700, 716, 886 A.2d 944, 954 (2005). *Ali* furthermore, is not akin to the case at bar and its guidelines are not instructive for this Court.

In *Ali*, the defendant set out to murder two individuals execution-style. *Id.* at 298, 550 A.2d at 926. One of these victims, Debbie Waligora managed to escape, *id.* at 299, 550 A.2d at 927, and became the principal witness for the State. *Id.* at 300, 550 A.2d at 927. While in the hospital Waligora gave the police three separate and, in part, inconsistent statements. *Id.* at 307–308, 550 A.2d at 931. At trial, in an effort to explain the inconsistencies, the State called the doctor who had treated Waligora upon her arrival at the hospital, *id.*, producing the following colloquy:

"[PROSECUTOR]: Do you have an opinion within a reasonable degree of medical certainty as to what, if any, side effects the two drugs being given together in those dosages at those times would have on Mrs. [Waligora]?

"[DR. SCHNEIDER]: Yes, I do.

"[PROSECUTOR]: Could you give us that please, Doctor?

"[DR. SCHNEIDER]: There are multiple potential side effects to these drugs. One is nausea and vomiting. The second is respiratory depression. Third is increased sleepiness or drowsiness. And fourth is a lack of complete ability to respond coherently to questions.

"[DEFENSE COUNSEL]: Objection.

"[THE COURT]: Overruled."

*Id.* at 309, 550 A.2d at 932. Rejecting the defendant's argument that the trial judge's refusal to exclude the doctor's testimony was error, this Court concluded that, although the

"prosecutor's ... last question strayed from the track established by the court. The doctor's answer did not. The objection to the question was properly overruled.

\* \* \*

"The prosecutor's final question went off track because he asked what side effects the drugs would have had on Waligora, rather than asking what side effects were known with reasonable probability to occur to a person such as Waligora. The doctor did not respond directly to the question, but answered only by stating that there are multiple side effects to the drugs, and naming four such side effects. The doctor's answer was entirely proper, and within the correct guidelines established by the trial judge. Notwithstanding the wording of the prosecutor's question, the answer did not suggest that the doctor was giving an opinion that Waligora had in fact suffered any of the known side effects."

*Id.* at 309–310, 550 A.2d at 932. From this holding, the majority assumes that, in situations where a testimonial question is found to be improper, the witness's response can be considered separately and properly admitted.

In *Ali,* the line of questioning was designed to get at the root of the inconsistent statements previously made by the victim. Specifically, the testimonial question was meant to establish the side effects of certain drugs on Waligora, not to

prove the ultimate issue. Unlike the case at bar, the doctor's testimony addressed neither the defendant's actions nor the defendant's intent.

Courts cannot divorce the testimonial question from the response. The purpose of a response is to answer the question asked. Accordingly, both the question and the answer are important and they are interrelated. Moreover, both the question and the answer are evidence. *See e.g. Sippio v. State,* 350 Md. 633, 641–642, 714 A.2d 864, 868–869 (1998); *see also Lucas v. State,* 116 Md.App. 559, 574–76, 698 A.2d 1145, 1152–1153 (1997); *Bell v. State,* 114 Md.App. 480, 488, 691 A.2d 233, 237–238 (1997); *State of Iowa v. Dinkins,* 553 N.W.2d 339, 340 (Iowa Ct.App.1996); *State of Connecticut v. Campbell,* 225 Conn. 650, 655, n. 6, 626 A.2d 287, 290, n. 6. (1993). Indeed, it is appropriate to ask: of what relevance is an answer without a question or when the question is irrelevant or inappropriate? An answer in a vacuum and without context is simply and largely meaningless.

Furthermore, as a matter of trial practice, when the question is objected to and the objection is sustained, as often is the case, the answer the witness would have provided is not permitted. This is because it, being dependent on the question, has no better claim to be heard; it would be inadmissible, as well. Similarly, when the court, upon reflection, after it has been answered, determines that a question is improper, it instructs the jury to disregard both the question and the answer. By parity of reasoning, when an appellate court determines that a question allowed by the trial court was improper, the impropriety which made the question improper and, thus, inadmissible, likewise renders the answer improper and inadmissible.

Moreover, the majority overlooks that the rules serve as a means to limit exposing the jury to unfairly prejudicial evidence. To separate the question from the answer for purposes of review does not acknowledge that, at the time the question was asked and subsequently answered, the jury did not hear the answer in a vacuum. The jury heard the

question followed by an answer. We also must assume that its deliberations proceeded on that basis and, in the process, the jury took both the question and the answer into consideration.

*C. That the petitioner's name was not used during Sgt. McDonough's testimony is not dispositive*

Sgt. McDonough, to be sure, did not expressly refer to the petitioner by name when responding to the prosecution's question. The majority opines that his answer did not " 'cross the line' " established by MRE 5–704(b), either because he did not mention the petitioner's name or because the reference to the petitioner was not specific enough to permit the trier of fact to infer that the prosecutor was addressing specifically the petitioner's intent. The majority states: "[a]s was the situation in *Gonzales, supra* Sgt. McDonough 'never directly and unequivocally testified to [Appellant's] mental state; he never stated directly that [Appellant] had the intent to distribute.' " *Gauvin,* 411 Md. at 710, 985 A.2d at 520 quoting *Gonzales,* 307 F.3d at 911. The majority then holds, "Sgt. McDonough's opinion was based upon his 'knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of [Appellant's] mind.' " *Gauvin,* 411 Md. at 711, 985 A.2d at 520 (quoting *Lipscomb,* 14 F.3d at 1243).

The majority's focus on whether Sgt. McDonough used the petitioner's name in his response distracts it from Rule 5–704 and the Rule's purpose. A police officer, qualified as an expert witnesses, is permitted for the benefit of the trier of fact to express opinions derived from his or her professional experience and training, as exactly that—generalized observations based on background. *See People v. Wright,* 283 A.D.2d 712, 713, 725 N.Y.S.2d 711 (3d Dep't 2001) ("We conclude that County Court properly allowed the officers to express opinions, based on their experiences as narcotics officers, as to whether they had ever encountered a mere user of narcotics— as distinguished from a seller . . . ."); *see also State v. Dinkins,* 553 N.W.2d 339, 342 (Iowa Ct.App.1996) (citing, *State v.*

*Olsen,* 315 N.W.2d 1, 7) (Iowa 1982)) ("[A]n expert witness is permitted to express an opinion as to whether the facts of the case fit the profile of 'a person who sells drugs.'"). In drug cases, this is usually limited to expressing opinions that will help the trier of fact to understand packaging, manufacturing and drug use generally. Police officers, and other expert witnesses alike, therefore, are not permitted to testify as to the defendant's guilt or innocence or his or her intent. An officer's opinion on whether the defendant possessed the intent to commit a crime is inadmissible. Md. Rule 5–704. *See People v. Wright,* 283 A.D.2d 712, 713–714, 725 N.Y.S.2d 711 (3d Dep't 2001) ("[I]it was error for the court to allow the experts to take the next step and express their opinion that the quantity of cocaine found in defendant's possession indicated that he was a seller...."); *Dinkins,* 553 N.W.2d at 341 (citing, *State v. Ogg,* 243 N.W.2d 620, 621 (Iowa 1976)) ("it was improper for a police officer to express his opinion that the quantity of drugs 'defendant possessed' would be more than would be considered for personal use.").

While courts have acknowledged that the line between testifying generally to provide background, as opposed to speaking to the specifics of the case is a fine one and often difficult to navigate, *see Dinkins,* 553 N.W.2d at 341("A fine line often exists between opinions which improperly express guilt or innocence in cases involving specific intent crimes and those which properly compare or characterize the defendant's conduct based on the facts of the case so as to assist the jury in understanding the evidence or to determine a fact in issue. This fine line is especially apparent in cases where the fighting issue is whether the accused possessed drugs with the intent to sell. This is because the quality and quantity of drugs, the manner of packaging, the manner of secretion, the presence of drug paraphernalia, and many other circumstances may reflect whether drugs are possessed for personal use or for distribution."), compliance is imperative for the defendant to have a fair trial.

When applying Md. Rule 5–704, Maryland courts, similar to its sister states, take into account the purpose of the rule.

The purpose is defeated if the rule is applied too narrowly. Certainly, the Rule is violated whenever the petitioner is the subject of a question or answer addressing his or her intent. Then, the testimony does not provide general information; rather, it is no more than speculation about that defendant's mental state. Even when the petitioner's name is not used or the petitioner is not referenced, there still may be a violation of Md. Rule 5–704. That occurs when the facts posited so closely mirror the facts of the case on trial that it is all but impossible for a trier of fact to separate the facts of the case from the hypothetical ones posed by the prosecutor. Both the direct and indirect approach present the same problem and ultimately usurp the role of the trier of fact in violation of Md. Rule 5–704.

The Connecticut courts have so held. In *Campbell*, the defendant was charged with crimes of possession of narcotics with intent to sell by a person who is not drug-dependent, possession of a weapon in a motor vehicle, and criminal impersonation. 225 Conn. at 651–652, 626 A.2d 287. During the trial, the following colloquy occurred:

"[The State]: Officer ... based on your training and experience and the undercover work you have done, your surveillance work you have done, the arrests you have made in your narcotics capacity as a statewide officer and such, if the vials, the 119 vials which were found on the defendant, based upon your opinion, is that used for personal use, or is that packaged with the possession with the intent to sell?

"[Officer Eason]: That would be possession with intent to sell.

"[The State]: What is the normal standard for someone just possessing, simple possession?

"[Officer Eason]: One, two, maybe three.

\* \* \*

"[The State]: Not 119?

"[Officer Eason]: No. Not 119."

*Id.* at 654, n. 6, 626 A.2d at 290, n. 6. The defendant was convicted of possession of narcotics with intent to sell and

sentenced to a 20–year term of imprisonment. *Id.* at 652, 626 A.2d 287. He argued, on appeal, that the expert witness "should not have been permitted to testify to his opinion on the ultimate fact of whether the defendant possessed the narcotics with the intent to sell or for his personal consumption." *Id.* at 656, 626 A.2d 287. The court agreed. *Id.* at 652, 626 A.2d 287. In so doing, the court considered only the prosecutor's question and the answer it elicited. It is significant that the defendant's name was not mentioned, either in the question or the answer. *Id.* at 654, n. 6, 626 A.2d 287.

*State v. White,* 450 So.2d 648 (La.1984) is to like effect. In that case, the defendant was charged with possession of heroin with intent to distribute. *Id.* at 648. The State called an expert witness in "packaging and distribution of controlled dangerous substances" and the following colloquy occurred:

"MR. L'HOSTE: This is a hypothetical question. If someone is standing on the corner of London and Dorgenois with a matchbox which contained twenty seven foils of heroin, in your professional opinion, what is the probability—what is the purpose of him standing there with that match box of heroin ...

"WITNESS: In my opinion, a person standing on the street corner with a matchbox containing say twenty-seven tin foils containing heroin, would be there for the purpose of selling or distributing."

*Id.* at 649. The defendant was convicted and subsequently challenged, on appeal, the admissibility of this expert testimony. The court first compared the case under review to previously decided cases:

"In *State v. Wheeler,* 416 So.2d 78 (La.1982), this Court held that the testimony of a narcotics officer in response to a hypothetical question was in fact an expression of opinion as to the defendant's guilt and constituted reversible error. The expert in Wheeler was given a detailed hypothetical paralleling the actual fact situation produced at trial, in which the defendant was apprehended on a street corner,

holding a grocery bag containing ten coin envelopes full of marijuana. He was then asked:

"Q. In your expert opinion what is the likelihood of this individual being involved in the distribution of marijuana?

"A. In my opinion the person would be involved in the distribution of marijuana, he might have a dime bag, but not several dime bags and he would not have $350.00. "416 So.2d 78, 79. This court found that the officers' testimony "was tantamount to an opinion that the defendant was guilty of the crime charged" an issue over which the officer was no more expert than the jurors, 416 So.2d at 81. "In *State v. Montana,* 421 So.2d 895 (La.1982), the defendant was arrested with his girlfriend for possession of heroin with intent to distribute. The officer testifying as an expert in drug trafficking was asked whether in his opinion, if a male and female were arrested, the male carrying $470.00 in cash and the female holding two balloons filled with heroin, the two were planning to distribute the heroin. Again, the facts in the hypothetical were identical to the evidence of defendant's activities shown at trial. Applying Wheeler, this court noted that inferences as to the ultimate issue of defendant's guilt are for the jury alone to determine, and held that the court's admission of the expert's opinion testimony constituted reversible error. 421 So.2d at 900."

*Id.* at 650. It then concluded:

"Comparing the present case with the *Montana* and *Wheeler* decisions, we find nothing which would distinguish the instant case and permit the testimony of Officer Peralta. The hypothetical factual situation posed by the State was virtually identical to the actual evidence produced at defendant's trial. By stating that in his opinion, a person standing on a street corner with 27 foils of heroin was there for the purpose of selling narcotics, Officer Peralta was usurping the jury's function as finder of fact."

*Id.* at 650–651.

Massachusetts courts treat this issue similarly. In *Commonwealth v. Tanner,* the defendant was convicted of two

separate counts of distribution of a controlled substance. 45 Mass.App.Ct. 576, 579–580, 700 N.E.2d 282 (1998). The defendant appealed this conviction, asserting that the testifying police officer was permitted improperly to give his opinion on her guilt. *See Id.* at 576, 700 N.E.2d 282.

Over defense counsel's objection, the officer initially stated, "From my experience, I believed a drug transaction had taken place." *Id.* at 577, 580, 700 N.E.2d 282. He later testified that the actions of defendant were "consistent with a drug deal." *Id.* at 578, 700 N.E.2d 282. With regard to whether the testimony was properly admitted, the appellate court held:

> "The real problem is the form of Feeney's testimony. As noted, he stated at one point, "From my experience, I believed a drug transaction had taken place." Later he opined that Gomes's actions were "consistent with, with the drug, the drug dealer with the drugs going into his mouth." While in the latter instance Feeney used the talismanic "consistent with" locution that both this court and the Supreme Judicial Court have approved in numerous prior cases, see, e.g., *Commonwealth v. Johnson,* 410 Mass. 199, 202, 571 N.E.2d 623 (1991), the former statement is very similar to expert testimony that we held improper in *Commonwealth v. Woods,* 36 Mass.App.Ct. 950, 951–952, 631 N.E.2d 1025 (1994), S.C., 419 Mass. 366, 375 & n. 13, 645 N.E.2d 1153 (1995)."

*Id.* at 579–580, 700 N.E.2d 282. Although concluding that the testimony was improperly admitted, the court affirmed the defendant's conviction because it determined the error to be harmless. *Id.* at 580, 700 N.E.2d 282.

*Dinkins, supra,* 553 N.W.2d at 339, although reaching a different result with regard to the challenged statement, is nevertheless instructive. In *Dinkins,*

> "Officer Collins, a narcotics officer, was asked by the prosecutor if the seven rocks of crack cocaine found in the plastic baggie were 'consistent with someone using or dealing?' He answered 'dealing' and explained, 'the people that we catch that are addicted, they get caught with one rock, certainly

no more than three. You have seven rocks, it indicates a dealer.' The State also asked Collins:

"Q: And, Officer, if testimony indicated that only two items of evidentiary nature were taken from that car, State's Exhibit 1 and the money that was found, State's Exhibit 2, no smoking devices, nothing else to indicate that the crack was being used, would that indicate anything to you?

"A: That they are dealing. A crack addict won't be caught without his pipe."

*Id.* at 340. The defendant was convicted of possession with intent to deliver a controlled substance, which he appealed arguing, among other things, that the officer had improperly been permitted to "express[ ] an opinion of his guilt on one of the essential elements of the crime, intent to deliver." *Id.* at 341. Affirming the judgment of the trial court, the court reasoned:

"Our prior cases have both approved and disapproved of expert testimony bearing on the issue of possessing drugs for personal use or for distribution. In *Oppedal,* the Iowa supreme court determined it was improper to permit a witness to give an opinion that 'a quantity of drugs was possessed by the defendant with intent to deliver.' *Oppedal,* 232 N.W.2d at 524. The court reasoned such an opinion was tantamount to an opinion as to the ultimate fact of defendant's guilt or innocence. *Id.* Similarly, in *State v. Ogg,* the court concluded it was improper for a police officer to express his opinion that the quantity of drugs 'defendant possessed' would be more than would be considered for personal use. *State v. Ogg,* 243 N.W.2d 620, 621 (Iowa 1976). In *State v. Nimmo,* the court again rejected opinion testimony regarding the intent with which the 'defendant possessed' quantities of drugs. *State v. Nimmo,* 247 N.W.2d 228, 230 (Iowa 1976). *See also State v. Vesey,* 482 N.W.2d 165, 167 (Iowa App.1991) (improper to express opinion that drugs were distributed from defendant's residence).

"On the other hand, an expert witness is permitted to express an opinion as to whether the facts of the case fit the profile of 'a person who sells drugs.' *State v. Olsen,* 315 N.W.2d 1, 7 (Iowa 1982). This type of opinion differs from the opinions expressed in *Oppedal, Ogg, Nimmo,* and *Vesey* because it does not specifically relate to the defendant. Instead, it is an opinion that the evidence in the case is consistent with selling drugs, and is properly admitted as a comparison for the jury, not an opinion of guilt. *Id.*

"In this case, the testimony of Officer Collins did not constitute an opinion of guilt of the defendant or that the defendant possessed drugs with the intent to sell. Neither the questions asked of Collins or the answers given to those questions related specifically to Dinkins. They also did not imply the violation of a statute by the use of statutory language, or include so much evidence that it necessarily referred to the defendant. Instead, the questions were based only on the evidence bearing on the activities of drug dealers.

" . . . The State may not ask whether an expert has an opinion or believes the defendant is guilty of the crime, or possessed drugs for sale as opposed to personal use. *State v. Oppedal,* 232 N.W.2d at 524. The State may properly ask a qualified expert, however, whether the particular facts of the case, stemming from the expert's field of expertise, would be characterized as drug dealing or drug consumption. *See State v. Odom,* 560 A.2d at 1207."

*Id.* at 341–42. Acknowledging that there is a difference between a general question and answer and one with facts particular to the case being reviewed, Iowa courts, therefore, focus on whether the opinion offered "specifically relate[s] to the defendant." *Id.* at 342.

In this case there was specific reference not only to the petitioner but also to other specifics of the case. The prosecutor asked Sgt. McDonough to form an opinion based on the "review of the evidence that was seized in this case and . . . observations regarding the testimony of the witnesses here today[.]" Within the constraints of the question posed, Sgt.

McDonough gave his opinion that the drugs were "possessed with intent to distribute." By permitting the opinion, the court violated Md. Rule 5–704.

*D. Sgt. McDonough's response to the prosecutor's question should be stricken pursuant to 5–704(b).*

I agree with the majority that the prosecutor's question was violative of Rule 5–704(b). It properly concludes: "the Circuit Court should have sustained the objection to this question on the ground that no expert is entitled to express the opinion that the defendant possessed a controlled dangerous substance with the intent to distribute it." *Gauvin,* 411 Md. at 711, 985 A.2d at 520.

The majority erred, however, by not reviewing Sgt. McDonough's response to the prosecutor's question in light of the question asked. Sgt. McDonough's answer was tailored to the prosecutor's question which sought to elicit a response with regard to the petitioner's intent. During Sgt. McDonough's testimony, the following colloquy occurred:

"[THE PROSECUTOR]: Sergeant McDonough, have you had occasion during the course of this case to review the evidence that was seized by Deputy Gray in connection with the arrest of Ms. Gauvin?

"[SGT. MCDONOUGH]: Yes, I have.

"[THE PROSECUTOR]: And have you had the occasion here today to hear the testimony of the witness who have come before you today in connection with this matter?

"[SGT. MCDONOUGH]: Yes, I have.

"[THE PROSECUTOR]: And based upon your review of the evidence that was seized in this case and based upon your observations regarding the testimony of the witnesses here today, do you have the ability to form an opinion as to whether or not the PCP that was seized from Ms. Gauvin on December 15th, 2006 was for her personal consumption or for distribution.

"[SGT. MCDONOUGH]: Yes, I was able to form an opinion.

"[THE PROSECUTOR]: And what is that opinion?

"[DEFENSE COUNSEL]: Objection, Your Honor, just for the record.

"[SGT. MCDONOUGH]: That the am—

"[THE COURT]: Certainly. Overruled.

"[DEFENSE COUNSEL]: Thank you.

"[MCDONOUGH]: That the amount would indicate to me that it was possessed with intent to distribute. I would base that on different factors."

Sgt. McDonough, at the direction of the prosecutor, answered a direct question about petitioner's intent in possessing PCP. In doing so, he made no reference to common practices. 27 Sgt. McDonough did, however, address the intent of petitioner in violation of 5–704(b).

The prosecutor questioned Sgt. McDonough about whether he was able to form an opinion "as to whether or not the PCP seized from Ms. Gauvin ... was for her personal consumption or for distribution." After the prosecutor instructed Sgt. McDonough to focus on petitioner and her case, the prosecutor then more specifically focused Sgt. McDonough's frame of reference: "And based upon your review of the evidence that was seized in *this* case and ... *your* observations regarding the testimony of the witnesses," (*emphasis added*), in the court at the time of trial. In answering this question, Sgt. McDonough stated: "Yes, I was able to form an opinion." Sgt. McDonough, then responded, "the amount would indicate to me it was possessed with intent to distribute." The prosecutor did not ask Sgt. McDonough whether the amount found was consistent with "common practices in the drug trade" *Gauvin*, 411 Md. at 711, 985 A.2d at 520, nor did Sgt. McDonough deviate from the question asked. Sgt. McDonough's response was clear: his reference to "the amount," referred back to the prosecutor's mention of the amount "seized from Ms. Gauvin." Sgt. McDonough affirmatively stated "the amount" was "possessed with the intent to distribute." Not until Sgt. McDonough's following sentence—"I would base that on different factors"—did he seek to support

this improperly offered conclusion with his background and experience in the field. It is not dispositive that Sgt. McDonough later explained to the court the basis for his conclusion that the drugs "were possessed with intent to distribute." The damage was done at the point when Md. Rule 5–704 was violated and the testimony was not stricken.

I would strike both the question and the answer as usurping the role of the trier of fact and violative of Maryland Rule 5–704(b). I would reverse.

Judge GREENE authorizes me to state that he joins this dissenting opinion.