**REPORTED**

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1593

September Term, 2013

_____

KEITH S. BARKLEY

v.

STATE OF MARYLAND

_____

Nazarian,
Reed,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed: September 2, 2014

Unlawfully to possess heroin is a misdemeanor subjecting the possessor to the risk of imprisonment for four years plus a fine of $25,000. Criminal Law Article, § 5-601. To possess that heroin with the intent to distribute it, however, escalates the crime into a felony with a maximum sentence of twenty years imprisonment. §§ 5-602, 5-608. How then does the State go about proving that specific intent to distribute which is the escalating trigger? The defendant, of course, could tell us, but defendants are seldom so forthright. As an alternative, the State sometimes looks into the mind of the defendant inferentially, with the help of an expert witness. There is a discernible line, however, between what the expert is permitted to tell us and what he may not. The burden of this appeal is to determine on which side of that line the testimony of the State's expert fell.

The appellant, Keith S. Barkley, was convicted in the Circuit Court for Wicomico County by a jury, presided over by Judge W. Newton Jackson, III, of 1) possession with intent to distribute heroin; 2) the simple possession of heroin; and 3) the simple possession of cocaine. On appeal he raises two contentions.

1. That Judge Jackson erroneously permitted a police detective, as an expert witness, to testify as to the appellant's state of mind; and

2. That Judge Jackson erroneously refused to allow him to discharge his attorney and to proceed pro se.

### Keeping Alleged Error In Perspective

To place the appellant's primary contention in perspective, we must ask, "Why would we, or why would anyone, care about the appellant's state of mind?" It is a legitimate contention, but it does affect only one of the three charges for which the appellant was

convicted. Even if the contention were to prevail, two of the appellant's three convictions would remain totally unscathed.

The hard core of basic facts in this case is not in dispute. On March 21, 2013, the appellant was arrested at the intersection of Lehigh Street and North Division Street in Salisbury. The legality of that warrantless arrest is not contested. In the presence of several other officers, Officer Brandon Caton of the Salisbury Police Department searched the appellant as an incident of the arrest. The Fourth Amendment reasonableness of that search incident is not contested. What that search revealed, moreover, is not factually contested.

Officer Caton recovered from the appellant's right front pocket 53 wax baggies containing a total weight of 10.7 grams of heroin. The 53 baggies were bundled together with a small rubber band. There was also recovered from the appellant's person five twenty dollar bills, one ten dollar bill, one five dollar bill, and eight one dollar bills. From the appellant's left front pocket Officer Caton recovered a glass smoking device containing trace amounts of cocaine on the glass pipe.

The evidence of the appellant's basic guilt is not controverted. As the appellant stood there on that street corner in the presence of three officers, he was indisputably in unlawful possession of both heroin and cocaine. With respect to the charges of unlawful possession, moreover, the state of the appellant's mind was immaterial. Crimes of simple possession require only a general intent to possess. A specific intent (either to distribute or to do anything else) is not involved.

The appellant was convicted on three charges. He was convicted for the simple possession of cocaine. That conviction, and the four-year sentence imposed for it, will not be affected by whatever happens on the present contention. The appellant was also convicted for the simple possession of heroin. That conviction will also be unaffected by the present contention. For sentencing purposes, the conviction for that lesser included offense, of course, was merged into the conviction for the greater inclusive offense of possession of heroin with the intent to distribute. Should the sentence for the greater inclusive offense for any reason be vacated, however, the now merged conviction for simple possession would reemerge from its state of suspended animation and, on remand for re-sentencing, become the predicate for a sentence in its own right. We will go forward with the contention but with the awareness that it can affect only the conviction for the specific-intent crime of possessing heroin with the intent to distribute it.

## Thinking About Thinking

The intent to distribute is, by definition, an element involving a defendant's <u>mens rea</u>. Frequently, however, the proof of that particular <u>mens rea</u>, to wit, that particular specific intent, is established by inference from the surrounding physical circumstances. What then were the surrounding physical circumstances in this case?

Of the 53 baggies of heroin taken from the appellant's right front pocket, those that were tested by the crime laboratory showed that each contained trace amounts of heroin. The chemist testified that the term "trace amount" refers to anything less than one-tenth of

- 3 -

a gram. Trooper First Class Kenneth Moore of the Maryland State Police, who was accepted as an expert on street level identification, sales, packaging, and marketing of narcotic drugs for distribution, testified, without objection, that heroin on the street is "normally" sold "in those little packages in 100th of a gram." He testified, without objection, that what was in the bags recovered from the appellant was what "you normally purchase."

The cash recovered from the appellant included a $10 bill and five $20 bills. Trooper Moore testified, without objection, that a baggie of heroin "on average will cost you about $20 a fold." He testified, without objection, that "oftentimes" drug dealers "utilize 20s and 10s, smaller denominations, there's not change."

Trooper Moore also testified, without objection, as to the characteristic possessory behavior of a "typical user" of drugs in contrast to the possessory habits of a distributor of drugs. With respect to a "typical user," he testified, without objection, "Most of the time heroin addicts nowadays don't normally carry their heroin around with them ... oftentimes you don't find larger amounts of heroin with a person that is a user. They use what they get and most of the time that's a bag or two at a time." He further testified, again without objection, that when making a street level arrest of a "typical user," the police would find "one to two bags" in the arrestee's pocket but would not typically find "all that cash in that pocket after they purchased their heroin." Fact by fact by fact, the prosecution was loading the major premise into the syllogism.

The number of baggies of heroin found on the appellant was 53. Trooper Moore testified, without objection, that "a bundle is what normally a middleman will buy as far as heroin. They are 13 bags." Four bundles of 13 baggies each would yield a product of 52 baggies, and the appellant had 53. Was there a miscount? Had 12 baggies already been sold from a fifth bundle? Or did one of the bundles come with an unexpected bonus? All this is grist for the jury mill! In any event, all of this testimony by Trooper Moore, unobjected to, dealt with general street level patterns and not with this appellant personally.

The stage was set. Having established the constituent elements without objection, the prosecutor put them all together for an omnibus conclusion. Although the question still meticulously referred not to the appellant personally but only to "an individual with this set of facts" generically, the alarm went off on the defense side of the trial table.

> [PROSECUTOR]: And combining all of this evidence, the fact that we don't have any needles or any way of using the heroin, the money in the pocket, the denominations, the number of bags, <u>are you able to form an expert opinion as to whether an individual with this set of facts</u> was engaged or possessing the heroin with the purpose of distributing it?
>
> [TROOPER MOORE]: What I've heard today based on the amounts that were located, the manner of the bands, the lack of any type of device to utilize the heroin, it's pretty evident to me just based on my training and experience here in Wicomico County in recent weeks that <u>it was destined to be distributed</u> to persons here in Wicomico County.
>
> [DEFENSE COUNSEL]: Objection, Your Honor, move to strike.

(Emphasis supplied).

At first it appeared that the court was ready to sustain the objection. If the question was not a question that was ultimately one for the jury, it was at least tantalizingly close.

> [DEFENSE COUNSEL]: Objection, Your Honor, move to strike.
>
> THE COURT: Based on what?
>
> [DEFENSE COUNSEL]: Your Honor, that is a question for the jury, that is not a question for this expert.
>
> THE COURT: Which is what, the question?
>
> [DEFENSE COUNSEL]: Whether or not he possessed with the intent to distribute. That is the question for the jury.
>
> THE COURT: That is an ultimate jury question so the witness's opinion is to be disregarded by the jury. Go ahead.

The prosecutor immediately threw out the life preserver of the critical distinction between the generic major premise that "any person with this pattern of behavior would be distributing" and the more suspect but unspoken minor premise that "the appellant with this pattern of behavior was distributing." It was, indeed, a fine line, but a dispositive one.

> [PROSECUTOR]: I believe if I could clarify for the record, Your Honor, the witness's testimony was whether this particular fact pattern would be indicative of an individual whose intent was to distribute heroin, he was not testifying as to the Defendant's particular mindset.
>
> THE COURT: As an individual in general as opposed to this particular Defendant?
>
> [PROSECUTOR]: Correct.
>
> THE COURT: All right, with that understanding the objection is overruled.

(Emphasis supplied).

This all may be a tempest in a teapot. The factual premises had all been established without objection. Trooper Moore had laid out the characteristic behavior of a distributor as contrasted to the more innocuous behavior of a mere user. The jury was readily capable, without spoonfeeding, of completing the syllogism for itself. The obvious syllogism before the jury was, stating it simplistically:

**All persons who exhibited such behavior probably intended to distribute.**

**The appellant is a person who exhibited such behavior.**

**ERGO: The appellant probably intended to distribute.**

The conclusion is as obvious as it is valid. Even without benefit of formal terminology, that is the way the human mind works. Less pedantically, the jury verdict may simply have been the drawing of an irresistible inference. "If it looks like a duck and walks like a duck and quacks like a duck, it's a duck." It is a classic inference. It is permissible, it is irresistible, and it is obvious. We are persuaded beyond all reasonable doubt, therefore, that the jurors would have drawn this inference, or would validly have reached this conclusion, for themselves even if no one else, from the witness stand or in closing argument, had articulated it for them. As this Court observed in Cirincione v. State, 75 Md. App. 166, 181-82, 540 A.2d 1151 (1988):

> In terms of its helpfulness to the jury, we find the distinction between an opinion as to a predicate fact that inevitably yields the ultimate fact and an opinion as to the ultimate fact itself to be a distinction without a difference.

We will not hypothesize a jury so dense that it would be helped by the latter opinion but would be left adrift by the former.

We will not, however, leap forward to an alternative holding of hypothetical harmless error on this contention because we adamantly believe that there was no error.

### Expert Opinions and Ultimate Issues

Our bottom-line decision that Judge Jackson was not in error in overruling the appellant's objection to Trooper Moore's testimony is easy. Explaining how we get to that decision is another matter entirely. Involved is the incredibly dense subject of expert opinions and ultimate issues. At the most fundamental level, the problem is that the law has been attempting, with only limited success, to create a general rule to cover a broad congeries of situations that defy generalization.

Under the pre-1994 regime of Maryland's common law of evidence, the rule had almost accidentally or haphazardly emerged that an expert witness could not give an opinion on an issue that was an ultimate issue for decision by a jury. Bentley, Shriver & Co. v. Edwards, 100 Md. 652, 665, 60 A. 283 (1905); McClees v. Cohen, 158 Md. 60, 68, 148 A. 124 (1930). The notion was that the expert should not be permitted to invade the province of the jury. The problem with the rule was that frequently it did not work. There arose so many ad hoc exceptions and modifications to the rule that the end product was chaotic. In 6 Lynn McLain, Maryland Evidence, § 704:1 at 971-72 (3d ed. 2013), Professor McLain describes the pre-1994 pandemonium:

The common law decisions, in excluding certain unhelpful, superfluous opinion testimony, often justified their rulings by stating that opinions on the ultimate issue to be decided by the jury in a case were inadmissible. This approach led to the creation of artificial distinctions and exceptions, where circumvention of the "rule" of inadmissibility of opinions on ultimate issues was necessary, for example, with regard to opinions regarding mental capacity and sanity, permanent disability, and forgery.

(Emphasis supplied).

When the Court of Appeals adopted the Maryland Rules of Evidence in 1994, it included Maryland Rule 5-704(a), which is identical to Federal Rule of Evidence 704(a). It provides:

(a) **In General.** Except as provided in section (b) of this Rule, testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

The new rule effectively abrogated the former prohibition. Professor McLain, § 704:1(b) at 973, both described and commended the change:

Modern Maryland case law, codified in Md. Rule 5-704(a), more wisely states that the fact that a witness's opinion addresses an ultimate issue as to which the judge or jury must reach a conclusion does not preclude automatically the witness's testifying to it. Rather, the question, as with regard to any opinion testimony, will be whether the witness's opinion is rationally based and would be helpful to the fact-finder. If both criteria are met, the opinion will be admissible under Md. Rule 5-701 as to a lay witness and under Md. Rule 5-702 as to an expert witness.

(Emphasis supplied).

The exception to that amelioration is subsection (b). The exception applies to criminal cases only. Rule 5-704(b) provides:

(b) **Opinion on Mental State or Condition.** <u>An expert witness</u> testifying with respect to the mental state or condition of a defendant in a criminal case <u>may not state an opinion</u> or inference <u>as to whether the defendant had a mental state or condition constituting an element of the crime</u> charged. That issue is for the trier of fact alone. This exception does not apply to an ultimate issue of criminal responsibility.

(Emphasis supplied).

The final sentence makes it clear that the prohibition of the earlier limitation on expert opinions does not apply to cases raising the issue of insanity or other aspects of criminal responsibility. The thing that is still prohibited is "an opinion ... as to whether the defendant had a mental state or condition constituting an element of the crime charged."

It is on Rule 5-704(b) that the appellant exclusively relies. He charges that the court erroneously received in evidence "an expert's opinion that Appellant possessed the heroin with the intent to distribute." One of the issues, of course, is that of whether the expert ever actually expressed an opinion that the appellant possessed an intent to distribute. The appellant does, in that regard, acknowledge a chink in his armor. He does not assert (on the facts of this case, he could not) that the expert opinion ever explicitly called him out by name or ever expressly stated that this appellant personally had an intent to distribute. He accused the expert opinion, more obliquely, of supplying the predicate from which an inference of the appellant's intent to distribute would necessarily be drawn. The appellant's argument is:

> The prosecutor cannot shield that this question was directed at Appellant's state of mind by proffering that the question was "whether this particular fact pattern would be indicative of an individual whose intent was to distribute heroin" rather than focusing on the specific intent of Appellant. Simply put, <u>there was no other individual discussed during trial "with this set of facts."</u>

- 10 -

The State alleged at trial only that Appellant was involved in "this particular fact pattern." <u>While the State attempted to disguise the question in the form of a hypothetical, the question was directed at the facts of this case and this case dealt only with Appellant.</u> <u>The State effectively inquired and received testimony about Appellant's mental state.</u> This testimony crossed this line and should have been excluded.

(Emphasis supplied).

The appellant's drop-back position necessarily is that the expert's suggesting his intent to distribute indirectly as part of a two-step process is tantamount to ascribing that intent to distribute to him directly as part of a one-step process. The argument is that if the appellant is the only person on trial, everything in the State's case is necessarily about him. He claims that the expert opinion rule protects him from ricochets as well as from direct hits. As we turn to the caselaw interpreting Rule 5-704(b), that is precisely the issue we must decide.

## Gauvin v. State

For better or for worse, the appellant relies on <u>Gauvin v. State</u>, 411 Md. 698, 985 A.2d 513 (2009). So, indeed, does the State. In <u>Gauvin</u> the critical conviction was for the possession of phencyclidine (PCP) with the intent to distribute. The defendant's actual possession of the PCP was not disputed. The key issue in the <u>Gauvin</u> case, as in this case, concerned the State's proof of the specific intent to distribute. The defendant's contention was that the court "permitted an expert witness to state an opinion that the defendant/appellant possessed PCP with an intent to distribute." 411 Md. at 700. The defendant's argument was that the expert's testimony was a forbidden opinion about his

"mental state or condition constituting an element of the crime charged" in direct contravention of Rule 5-704(b).

Although Judge Murphy's opinion for the Court of Appeals affirmed the conviction and held that "the testimony at issue did not violate Rule 5-704(b)," 411 Md. at 700, it did, in passing, give the appellant here a small moral victory, around which he now builds his entire argument. The Gauvin opinion observed that the question put to the expert by the prosecuting attorney did violate Rule 5-704(b), although, more significantly, the ultimate answer given by the expert did not. The offending question was:

> [D]o you have the ability to form an opinion as to whether or not the PCP that was seized from Ms. Gauvin on December 15, 2006 was for her personal consumption or for distribution?

411 Md. at 701-02 (emphasis supplied). With respect to that question itself, the Court of Appeals was firm in its disapproval.

> In the case at bar, it is clear that the prosecutor's question – "whether or not the PCP that was seized from [Appellant] was for her personal consumption or for distribution?" – sought an opinion that is prohibited by MRE 5-704(b). The Circuit Court should have sustained the objection to this question on the ground that no expert is entitled to express the opinion that the defendant possessed a controlled dangerous substance with the intent to distribute it.

411 Md. at 710-11 (emphasis supplied).

In redeeming contrast to the offending question, however, the less personally focused response of the expert witness was based on neutral physical circumstances.

> [T]he amount would indicate to me that it was possessed with intent to distribute. I would base that on different factors.

411 Md. at 702 (emphasis supplied).  The expert went on immediately to explain that "a 'hand-rolled' cigarette is commonly used to ingest PCP" and that "the 18 doses of PCP seized from the vehicle 'is  kind of [an] unusually large amount for just a user to be driving around with in a vehicle.'"  He proceeded to detail his analysis of the tangible evidence.

> This is – in my opinion – again, based on just, you know, the 18 doses average of what you would use a cigarette for, the going rate going 15 to 20 dollars per dipper or a cigarette laced or saturated with phencyclidine, the money that was also recovered, the $250 was all in twenties.  There is obviously liquid missing from these vials.  So that would indicate to me that some of it had already been distributed.  It's not uncommon for people – the gloves also help add to that opinion because users and people that handle PCP are aware that it is transdermal, that it is absorbed through the skin.  Also people that – it's common also even amongst crack dealers where it's not transdermal where they say they don't leave fingerprints on any of the things that they have handled.  So it serves kind of a dual purpose when you see the rubber gloves there.

Id. (emphasis supplied).

Judge Murphy explained that the expert witness never "crossed the line" established by Rule 5-704(b) and that his opinion was, therefore, admissible.

> Sgt. McDonough, however, never expressed an opinion that "crossed the line" established by MRE 5-704(b).  ... Sgt. McDonough "never directly and unequivocally testified to [Appellant's] mental state; he never stated directly that [Appellant] had the intent to distribute."  ... Sgt. McDonough's opinion was based upon his "knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of [Appellant's] mind." No unfair prejudice occurs when an erroneous evidentiary ruling results in the introduction of admissible evidence.

411 Md. at 711 (emphasis supplied).

- 13 -

The Court of Appeals made it clear, moreover, that it is the actual opinion rendered by the expert and not the antecedent question that is controlling in a Rule 5-704(b) analysis.

> [A]lthough the prosecutor's question "strayed from the track" established by MRE 5-704(b), Sgt. McDonough's "answer did not." Under these circumstances, Appellant is not entitled to a new trial on the ground that Sgt. McDonough expressed an opinion that should have been excluded under Md. Rule 5-704(b).

411 Md. at 713 (emphasis supplied).

Before turning our attention to the quality of the expert opinion given by the expert in Gauvin, it behooves us to note that the affirmance of the conviction in the case now before us does not depend on Gauvin's distinction between the question and the answer. In Gauvin the offending question focused in very personally on "the PCP that was seized from Ms. Gauvin" and asked whether the expert thought it was "for her personal consumption or for distribution." 411 Md. at 701-02 (emphasis supplied). In the present case, by contrast, the question, after listing the physical factors developed by the police, sought an opinion about "whether an individual with this set of facts" would have "the purpose of distributing?" "An individual with this set of facts" could be anybody. The question was appropriately generic.

> With respect to the expert opinion, the Gauvin opinion focused on

> the critical distinction between (1) an explicitly stated opinion that the criminal defendant had a particular mental state, and (2) an explanation of why an item of evidence is consistent with a particular mental state.

411 Md. at 708.

- 14 -

An admissible expert opinion may come close to a defendant's state of mind or specific intent and may strongly suggest the answer to that ultimate issue but it stays deftly one step back from the ultimate answer. It brings to mind the classical philosophical problem of how progressively closer one can approach toward a point without getting there. Unlike in horseshoes, close does not count. Gauvin quoted with approval from Christopher B. Mueller & Laird C. Kirkpatrick, Evidence, § 7.13 at 670 (4th ed. 2009):

> Expert testimony at one remove from such ultimate issues as intent may be admitted even though it indirectly supports a conclusion or suggests an inference on some ultimate issue. Thus testimony describing typical patterns of organized crimes or conspiracies does not violate FRE 704(b) even though it provides evidence that persuades a jury, in light of what defendant and others are shown to have done, that the requisite intent existed.

411 Md. at 708 (emphasis supplied).

Gauvin relied heavily on the two federal cases of United States v. Lipscomb, 14 F.3d 1236 (7th Cir. 1994), and United States v. Gonzales, 307 F.3d 906 (9th Cir. 2002). In Lipscomb, three law enforcement officers offered expert opinions that the cocaine seized from the defendant's person was "for street level distribution." The Seventh Circuit, 14 F.3d at 1242-43, explained why such expert opinion did not run afoul of Federal Rule of Evidence 704(b).

> [W]e conclude that when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes. Relevant in this regard, though not determinative, is the degree to which the expert refers specifically

- 15 -

to the "intent" of the defendant, ... for this may indeed suggest, improperly, that the opinion is based on some special knowledge of the defendant's mental processes.

In this case, <u>each of the challenged opinions was immediately followed by a precise explanation of the grounds for the opinion</u>, and <u>the grounds cited made it clear that the officers were relying on their knowledge of common practices in the drug trade, rather than on some special familiarity with the workings of Lipscomb's mind.</u>

411 Md. at 708-09 (emphasis supplied).

In the <u>Gonzales</u> case, also relied on by <u>Gauvin</u>, the critical issue was proof of the specific intent to distribute narcotics. A DEA agent, qualified as an expert in drug distribution and possession, "was asked whether the particular amount of drugs found on a person indicated whether such an individual possessed the drugs for personal use or for distribution." 307 F.3d at 911. The defendant's claim on appeal was indistinguishable from the one now before us.

On appeal, Gonzales argues that the district court erred in admitting Heald's expert testimony because it consisted of an opinion about Gonzalez's mental state, in violation of Rule 704(b) of the Federal Rules of Evidence.

<u>Id.</u>

The <u>Gonzales</u> opinion, quoted with approval by <u>Gauvin</u>, 411 Md. at 710, held that the expert's opinion, albeit making the conclusion that Gonzales had the intent to distribute almost inevitable, did not cross the fine line between an express assertion and providing the basis for an inference.

<u>Heald never directly and unequivocally testified to Gonzalez's mental state; he never stated directly that Gonzales had the intent to distribute.</u>  Rather, <u>he</u>

- 16 -

indicated his firm conviction that a "person" possessing the evidence in question would, in fact, possess the drugs for the purpose of distributing.

307 F.3d at 911 (emphasis supplied).

This Court in Pringle v. State, 141 Md. App. 292, 785 A.2d 790 (2001), rev'd on other grounds, 370 Md. 525, 805 A.2d 1016 (2002), rev'd on other grounds, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003), reached precisely the same conclusion with respect to an expert opinion and its admissibility under Rule 5-704(b). The conviction was for the possession of cocaine with the intent to distribute. Detective Frank Massoni was accepted as an expert in controlled substances. He testified that the drugs in that case "were intended to be distributed." 141 Md. App. at 299. The contention in Pringle was the same as that now before us.

> Appellant contends that the evidence was inadmissible under Rule 5-704(b) because it constituted an opinion as to appellant's mental state at the time of his arrest.

141 Md. App. at 300.

In Pringle the prosecutor's question, unlike the question in this case but like the offending question in Gauvin, did appear to be too focused on the defendant by name.

> [D]o you have an opinion, based upon that expertise, within a reasonable degree of scientific certainty, as to whether the defendant intended to distribute the cocaine that is enclosed in those five zip lock baggies?

141 Md. App. at 299 (emphasis supplied).

The expert's opinion, on the other hand, kept the defendant's person out of the colloquy and based the conclusion on the physical facts themselves.

> [Witness]: My opinion is that <u>the drugs</u> that were here <u>were going to be distributed</u> in some form or fashion, either to regain money or to be used for sex.
>
> [Prosecutor]: And how is it you come to that opinion, officer?
>
> [Witness]: <u>Based on the statement that I have before me</u> and the fact that, I mean, <u>we have got five baggies and they are packaged individually, which is the way they are usually packaged for resale, generally twenty dollar bags.</u>

141 Md. App. at 300 (emphasis supplied).

Judge James Eyler's opinion for this Court made it clear that the expert's opinion was properly based on the physical circumstances themselves and not on any special insight into the mind of the defendant.

> Contrary to appellant's contentions, <u>Detective Massoni did not explicitly or implicitly testify that appellant intended to distribute drugs.</u> Rather, <u>Detective Massoni's opinion related to the quantity and packaging of the drugs</u> that were <u>contained in five zip lock baggies each containing similar amounts of cocaine.</u>

<u>Id.</u> (emphasis supplied).

Even though the circumstances may implicate the defendant, an opinion based on the circumstances themselves rather than on some special knowledge about the defendant's mind does not offend Rule 5-704(b).

> Detective Massoni <u>based his expert opinion on several factors, including the packaging of the drugs</u>, appellant's statement, and his expertise in drug distribution, packaging and recognition.

141 Md. App. at 301 (emphasis supplied). See also <u>Ayala v. State</u>, 174 Md. App. 647, 664-66, 923 A.2d 952 (2007); <u>Cantine v. State</u>, 160 Md. App. 391, 405-06, 864 A.2d 226

(2004); <u>Diaz v. State</u>, 129 Md. App. 51, 74-77, 740 A.2d 81 (1999); <u>Lucas v. State</u>, 116 Md. App. 559, 578-80, 698 A.2d 1145 (1997).

## Conclusion

Far from crossing the line, Trooper Moore's expert opinion in this case that the 53 baggies of heroin were intended for distribution did not even get close to the line. The question itself summed up four undisputed physical circumstances and then asked whether any "individual with this set of facts" would intend to distribute. Trooper Moore did not even know the appellant and had no special knowledge about the appellant's mind. His opinion was based exclusively on "[w]hat I've heard today based on the amounts that were located, the manner of the bands, the lack of any type of device to utilize the heroin." His expert opinion did not offend Rule 5-704(b). The appellant's state of mind could be inferred from the circumstances themselves, as ultimately it was.

## Discharging Counsel in Mid-Trial

The second contention conerns the appellant's effort to discharge his counsel. The trial took place on September 9, 2013. The appellant was represented by an assistant public defender. Following the swearing in of the jury and opening statements by the prosecution and defense, the State proceeded to present its case-in-chief. Two State's witnesses were examined, cross-examined, and excused. The third witness was Officer Brandon Caton of the Salisbury Police Department. Following direct examination by the prosecution, the assistant public defender began her cross-examination. In the course of that cross-

examination, counsel informed the court that a serious dispute had arisen between her and the appellant with respect to her conduct of the cross-examination.

[DEFENSE COUNSEL]:  Your Honor, <u>my client is having an issue with the questions that I'm asking the witnesses.</u>  <u>He believes that I'm not asking questions that he wants asked.</u>  I'm exercising my discretion in asking these questions.

[THE DEFENDANT]:  Your Honor, what it is –

THE COURT:  You want her to be your lawyer?

THE DEFENDANT:  What it is –

THE COURT:  Well, let me ask you a question.  Are you a lawyer?

THE DEFENDANT:  Huh?

THE COURT:  Are you a lawyer?

THE DEFENDANT:  No.  I know enough about my case and the law and what went on that what ain't being established in this case right now.

THE COURT:  Well, <u>you have a right to testify if you want.  You can testify later.</u>

THE DEFENDANT:  I know I can testify but <u>she has evidence</u> like awhile ago he came and stopped me but <u>this cop told her he did not offer testimony</u> that he knew.

THE COURT:  I don't know –

THE DEFENDANT:  <u>That he did not know anything.</u>

THE COURT:  You have an attorney representing you.  The attorney is the person to ask questions and to make oral argument and to make legal argument.

THE DEFENDANT:  I made that argument awhile ago.

- 20 -

THE COURT:  <u>So you have the right to talk to your attorney</u> and I would suggest you whisper to her so the jury doesn't hear what you're saying.

THE DEFENDANT:  <u>I did but she didn't agree with me.</u>

THE COURT:  So just deal or talk to your own attorney.  You can't come up here and tell me.

(Emphasis supplied).  Our quotation in full of the colloquy between the appellant and the trial judge is not without significance, as will be more fully discussed <u>infra</u>.

At that point the appellant indicated that he wanted to discharge his assigned counsel for the specific reason that she was not asking the questions that the appellant wanted to be asked.  Judge Jackson warned him that if he discharged his lawyer he would be left to represent himself.

THE DEFENDANT:  But I'm saying <u>I did not want to go ahead with this trial.</u>

THE COURT:  You want to fire – <u>you want to discharge your attorney?</u>

THE DEFENDANT:  <u>Because she's not asking the questions that are supposed to be asked.</u>  She has a witness go off the stand who was perjuring.

THE COURT:  Listen to me, Mr. Barkley.  <u>You have a right to represent yourself if you want.</u>  <u>You can discharge [defense counsel], but then you're on your own, you're representing yourself.</u>  <u>I don't think you want to do that.</u>  You want to be your own lawyer?  <u>I don't think you want to be your own lawyer.</u>

(Emphasis supplied).

The appellant persisted that he wanted to represent himself so that he could recall the State's witnesses who had already testified and ask questions of them that he thought should have been but were not originally asked.

THE DEFENDANT:  <u>I need to recall them back again</u> to establish –

THE COURT:  You have a lawyer.  He doesn't want to fire his attorney.  Go back to the trial table.

THE DEFENDANT:  No, I'm saying <u>I want to represent myself to recall them.</u>

THE COURT:  <u>We're not going to recall any witnesses.</u>

THE DEFENDANT:  <u>Because she didn't establish that he lied to her in this courtroom.</u>  <u>He said on July 12th that he didn't remember anything, but said yet he testified and told a lie.</u>

(Emphasis supplied).

Judge Jackson then directed the jury to retire to the jury room.  Officer Caton was excused from the stand and told to wait in the hall.  Judge Jackson then invited the appellant to explain fully his basis for his dissatisfaction with counsel.  The gist of the appellant's complaint was that a policeman had lied on the stand, but that his attorney had failed to expose the falsity.

THE COURT: <u>Now that the jury has left the courtroom</u>, they are in the jury room, <u>tell me what it is you want to say, Mr. Barkley.</u>

THE DEFENDANT: <u>She advised me that Lieutenant King on July the 12th told her</u> when asked what did he hear, what did you remember hearing on the thing, he said <u>he don't remember anything.</u>  <u>And he's coming here today, and he just testified</u> on that stand <u>that he heard me say $20, which I know I didn't say,</u> that's all a lie.  <u>Every officer that took that stand is telling</u>

- 22 -

<u>a bald-faced lie</u> and the only way to prove anything if they had recorded it. They didn't record anything, because none of that happened.  Nothing like they're saying.  And I'll take a polygraph and you make them take a polygraph because it's just a lie.  You know they in here telling a bald-faced lie in everything that just happened.  <u>Everything they are saying is a lie.</u>  And how you going to prove it because they didn't tape it, when they had it in their power to tape the conversation.  <u>They're lying.</u>

THE COURT:   All right you have an attorney.   <u>You have an experienced attorney.  You have an Assistant Public Defender who I have recognized or have had before me many times and I recognize her to be a very capable criminal defense attorney.</u>  You on the other hand told me you have not been to law school, you are not a lawyer, I assume you are not trained in the law in any way.  You have a good attorney.  <u>Are you telling me you wish to fire your attorney?</u>

THE DEFENDANT:  I'm saying, Your Honor, right now releasing them witnesses from the witness stand –

THE COURT:  <u>That's not what I'm asking you.</u>

THE DEFENDANT:  – without questioning the proper questions.

THE COURT:  That's not what I'm asking.

THE DEFENDANT:  <u>Then yes.</u>

THE COURT:  <u>And you understand those witnesses cannot be recalled.  They are not going to come back and testify.  You've also sat next to your attorney, you could have whispered in her ear.</u>

THE DEFENDANT:  <u>I did tell her, but you excused the witness off the stand.</u>

THE COURT:  Well, maybe she knows what's better for you than you do.  Maybe she knows what to ask.

THE DEFENDANT:  <u>How is that better when he lied?</u>  He lied on the stand.  You're not going to establish the fact that he lied and when she know

it and the State's Attorney go up there and you not allow it in.  How is that being fair?

THE COURT:  There's no need for you to argue to me.

THE DEFENDANT:  That's not being fair.

THE COURT:  There's no need to argue with me.

THE DEFENDANT:  You're saying I can't recall a witness back to establish that fact?

(Emphasis supplied).

Although the appellant persisted in wishing to discharge counsel, it also became clear that the reason for the requested discharge was so the appellant himself could then recall the witnesses and also so that he could call the assistant public defender as a defense witness. Judge Jackson admonished him that, even if he represented himself, he could do neither. Those purely anticipatory rulings, we hasten to point out, are not an appellate contention in this case.  Their hypothetical merit or demerit is not an issue before us.

THE COURT:  Right now you have an attorney.  My recommendation is that you keep that attorney; however, if you wish to discharge your attorney I'll consider your request.  Tell me what you want to do.

THE DEFENDANT:  I want to discharge her.

THE COURT:  You want to discharge her.  And that means you understand you will be alone sitting by yourself at the trial table.

THE DEFENDANT:  Yes, and I want to take and recall.

THE COURT:  No, you cannot recall the witnesses, they've already testified.

THE DEFENDANT:  <u>Why can't I rebut and call them</u> in to re ask them and reestablish?  If she have to take the witness stand, I can go from here and then have her to say what the officer said.  I can take over and call her as a witness because she stated it to me.  I can do that, can't I?

THE COURT:  Call whom as a witness?

THE DEFENDANT:  [Defense counsel].

THE COURT:  <u>Your attorney cannot testify.</u>

THE DEFENDANT:  <u>Why can't she?</u>  She heard what he said on July 12th to know that he told a lie on this witness stand.  That he perjured, that's definitely something for the jury to hear.  He perjured on the witness stand.  He perjured.  Officer Sigmund perjured.

THE COURT:  Well, you also know, and <u>I told you this earlier at the bench.  You're not required to testify.</u>  If you don't testify I'm going to tell the jury that they cannot assume you're guilty and that you have an absolute constitutional right not to testify and you're presumed innocent.  <u>But you also have the right to testify.</u>

THE DEFENDANT:  <u>I am testifying.</u>

THE COURT:  <u>Well, you also need to talk to your attorney before you do that</u> because the State can impeach you with evidence of convictions of other crimes, too.

THE DEFENDANT:  I'm aware of that, which <u>a motion in limine should have been filed in that case, but it wasn't.</u>

(Emphasis supplied).

Having heard enough to understand fully the appellant's position, Judge Jackson noted that the State still had two expert witnesses to call and that the appellant was almost certainly incompetent to cross-examine an expert witness. The appellant's tentative flirtation with representing himself, moreover, was expressly for the alternative purposes of 1)

- 25 -

recalling witnesses to the stand and 2) "shutting down" the jury trial then in progress, postponing the case, and subsequently going forward with a "bench trial."  Judge Jackson firmly informed him that neither one of those procedures would be permitted.  The court's final decision was that the trial would go forward, the discharge of counsel would not be permitted, and the assistant public defender would continue to represent the appellant.

> THE COURT: We still have a lot to do in this trial, there are more witnesses to call from the State's point of view, including two expert witnesses.  <u>I doubt very seriously you know how to cross-examine an expert witness.</u>  Maybe you do, I don't know.  <u>I strongly urge you to retain [Defense Counsel] as your lawyer</u>, but it's your choice.  The trial will continue right now from this point forward.  <u>You will not recall any other witnesses.</u>  So tell me what you want to do.

> THE DEFENDANT:  So you're not going to let me be able to establish it, <u>so I can't call her to the witness stand?</u>

> THE COURT:  <u>That creates a lot of problems and the answer is no</u>, you cannot call your own criminal defense attorney to the witness stand.  She was not present at the events.

> THE DEFENDANT:  She was present for what he stated to her on July 12th during the hearing.

> THE COURT:  So the answer is no.

> THE DEFENDANT:  He perjured on the stand today by what was being established.

> THE COURT:  Mr. Barkley, you're not answering –

> THE DEFENDANT:  <u>Okay.  Then what if I say okay, I just shut down the jury thing today and I want to postpone and then go ahead and have a bench trial.</u>

THE COURT: Well, it's not going to be postponed. We're not going to postpone your trial, you've started with a jury trial. If you want to excuse the jury now and have a bench trial, we'll continue forward because I've heard the witnesses. There's no need to start over.

THE DEFENDANT: And still I can't start over?

THE COURT: No.

THE DEFENDANT: So I can't establish the fact of what he said. You're not going to allow the establishment to show that he perjured.

THE COURT: From what I'm hearing you don't want to discharge [Defense Counsel] so she will continue in the case as your attorney. Bring back in the jury.

(Emphasis supplied).

The trial then proceeded with no further snags or signs of discord between the appellant and his attorney. The assistant public defender competently cross-examined the State's expert witnesses, appropriately moved for a judgment of acquittal, and ably delivered a closing argument to the jury.

## "Meaningful Trial Proceedings" Had Begun

This is not a case involving the "precise rubric" of Maryland Rule 4-215(e). That Rule's prescribed rigid drill for considering the requested discharge of counsel only applies pretrial. Once meaningful trial proceedings have commenced, the decision of whether to permit the discharge of counsel is entrusted to the discretion of the trial judge. In State v. Brown, 342 Md. 404, 426, 676 A.2d 513 (1996), the Court of Appeals was unequivocal.

[T]he right to substitute counsel and the right to self-representation are, of necessity, curtailed once trial begins. After meaningful trial proceedings have

commenced, the decision to permit the defendant to exercise either right must be committed to the sound discretion of the trial court. Once trial begins, therefore, Rule 4-215 no longer governs, although the court must still adhere to constitutional standards.

(Emphasis supplied).

That holding was reaffirmed by State v. Campbell, 385 Md. 616, 632, 870 A.2d 217 (2005).

Our focus now must shift to the logistical requirements imposed upon a request to discharge counsel. We have held that a defendant's right to waive counsel and proceed pro se or to substitute counsel is more limited once "meaningful trial proceedings" have begun, because the mandatory nature of Rule 4-215(e) is inapplicable, and the "decision to permit discharge of counsel after trial has begun is within the sound discretion of the trial court."

(Emphasis supplied). See also State v. Hardy, 415 Md. 612, 624, 4 A.3d 908 (2010) ("Rule 4-215(e) ceases to apply as soon as 'meaningful trial proceedings' begin."). The Sixth Amendment right to represent oneself per Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975), is not nearly so unforgiving as Maryland Rule 4-215(e).

In Campbell, 385 Md. at 634, it was held that meaningful trial proceedings had begun when the request to discharge counsel came at the close of the State's case-in-chief.

In the present case, Campbell made a request to discharge counsel at the close of the State's case-in-chief and after defense counsel had announced that Campbell had elected to remain silent. We find that "meaningful trial proceedings" definitely had begun, rendering Rule 4-215(e) inapplicable.

(Emphasis supplied).

The request to discharge counsel came at a significantly earlier juncture in State v. Brown, 342 Md. at 410, where it was made "[b]efore the State completed the direct

- 28 -

examination of the first witness." It was nonetheless held that meaningful trial proceedings had begun. In State v. Hardy, 415 Md. at 627, meaningful trial proceedings were deemed to have begun even during the course of, but prior to the completion of, the voir dire examination of prospective jurors.

> Two considerations inform our conclusion that the proper resolution of this issue is that "meaningful trial proceedings" have begun when a request to discharge counsel is made during voir dire. First, voir dire is a "meaningful trial proceeding" under the plain meaning of the phrase. ...
>
> Second, voir dire is a "meaningful trial proceeding" under the functional definition of the phrase.

(Emphasis supplied).

By those lights, the request to discharge counsel in this case, first arising during the cross-examination of the third State's witness and deeper into the trial than had been the case in either State v. Brown or State v. Hardy, clearly came after meaningful trial proceedings had begun.

## The Standard of Review Is the Abuse of Discretion

In relaxed contrast to the regime of Rule 4-215, where even substantial compliance will not pass muster, the decision of whether to permit the discharge of counsel once meaningful trial proceedings have begun is comfortably entrusted to the broad discretion of the trial judge. As Judge Raker stated in State v. Brown, 342 Md. at 420:

> We agree with the conclusion reached by the Court of Special Appeals in Ross and in Johnson, that the decision to permit discharge of counsel after trial has begun is within the sound discretion of the trial court.

- 29 -

(Emphasis supplied).

Judge Harrell in State v. Hardy, 415 Md. at 621-22, was emphatic about the breadth and flexibility permitted under a discretionary ruling:

> Where a motion to discharge counsel is made during trial, however, Rule 4-215(e) does not apply, and we evaluate the trial court's ruling on a motion to discharge counsel under the far more lenient abuse of discretion standard. We have noted that a court abuses its discretion in this regard only when it acts "without reference to any guiding rules or principles," and that we find an abuse of discretion only when the court's act is so untenable as to place it "beyond the fringe of what the court deems minimally acceptable."

(Emphasis supplied). See also State v. Campbell, 385 Md. at 632 ("[T]he decision to permit discharge of counsel after trial has begun is within the sound discretion of the trial court.").

### Providing the Appellant a Forum

Although the caselaw universally holds that the ultimate decision of whether to permit the discharge of counsel is entrusted to the broad discretion of the trial judge, there is one antecedent procedural step that is mandatory. The defendant must be afforded the opportunity to explain to the court why he wishes to discharge his counsel. The ultimate decision remains discretionary. What is mandatory is the provision of the opportunity to explain. State v. Brown, 342 Md. at 428, was very clear.

> [T]he trial court must determine the reason for the requested discharge before deciding whether dismissal should be allowed. While the trial court has broad discretion, once trial has begun, to determine whether dismissal of counsel is warranted, the court's discretion is not limitless. The court must conduct an inquiry to assess whether the defendant's reason for dismissal of counsel justifies any resulting disruption.

(Emphasis supplied).

- 30 -

In <u>State v. Campbell</u> the defendant was not given nearly as formal an opportunity to address the court as the appellant enjoyed in the present case. Even in that case, however, the informality still did not matter, because preceding exchanges had already made clear to the trial judge the nature of Campbell's dissatisfaction with his attorney. As long as the message itself gets across, that is the critical factor that is dispositive.

> <u>Because Campbell's reasons</u> for wanting to dismiss his counsel <u>were apparent</u> based upon his statements, <u>the trial judge was not required to make any further inquiry.</u>

385 Md. at 635 (emphasis supplied).

<u>State v. Hardy</u>, 415 Md. at 628, made perspicuously clear that the trial court must provide the defendant a forum. Once that forum has been provided, what the trial court then does by way of response, however, is measured by the deferential abuse of discretion standard.

> When a defendant makes a request to discharge counsel at a time when Rule 4-215(e) does not apply strictly, "[t]he court must conduct an inquiry to assess whether the defendant's reason for dismissal of counsel justifies any resulting disruption" and rule on the request exercising broad discretion. <u>The court's burden</u> in making this inquiry <u>is to provide the defendant the opportunity to explain his or her reasons for making the request</u>; in other words, <u>the court need not do any more than supply the forum</u> in which the defendant may tender this explanation.

(Emphasis supplied).

At that point, the reins get looser and appellate scrutiny mellows into a more deferential mood.

- 31 -

If the court provides this opportunity, <u>how to address the request is left almost entirely to the court's "sound discretion."</u>

415 Md. at 629 (emphasis supplied).

As the preceding pages of this opinion copiously reflect, the appellant was allowed to air his grievances without impediment, even if not to his ultimate satisfaction. The witnesses were excused to the hallway and the jurors were cleared from the courtroom so that the appellant could give full vent to his chagrin at his assigned public defender. He was given an open microphone and was neither gagged nor censored in any way.

In terms of the ultimate decision not to permit the discharge of counsel, there were substantial factors supporting Judge Jackson's judgment. He was familiar with the skill and proven experience of the assistant public defender assigned to the appellant, as well as with the perils of <u>pro</u> <u>se</u> representation.

> THE COURT: All right you have an attorney. <u>You have an experienced attorney.</u> You have <u>an Assistant Public Defender who I have recognized or have had before me many times and I recognize her to be a very capable criminal defense attorney.</u> You on the other hand told me you have not been to law school, you are not a lawyer, I assume you are not trained in the law in any way. <u>You have a good attorney.</u>

(Emphasis supplied).

Judge Jackson was also at the procedural control panel and had determined that the appellant was not going to be permitted to do either of those two specific things for which he desired to represent himself, to wit, to recall excused witnesses or to abort the jury trial

then in progress. A good reason for denying a requested discharge is the awareness that by the discharge the appellant will be able to accomplish nothing that he seeks to accomplish.

Judge Jackson was alert to the forensic white water that lay ahead for a legally untrained layman.

> THE COURT: We still have a lot to do in this trial, there are more witnesses to call from the State's point of view, including two expert witnesses. I doubt very seriously you know how to cross-examine an expert witness.

There may always be, moreover, factors that do not appear in the cold record before us. It is the trial judge who has lived through the trial process and has observed the players. He is there on the ground and his thumb is on the pulse of the trial. He just may have the intuitive "sense" or "feel" that the appellant is a loose cannon on the deck and that entrusting to him the conduct of the rest of the trial could be an invitation to disaster. This for us, of course, is only conjecture, but it is why appellate review defers to the umpire on the field and does not presume to second-guess judgment calls.

Even if, arguendo, there were plausible arguments pushing in the opposite direction (we are aware of none), that would create, at most, a moot controversy that judges could reasonably resolve in either direction without abusing their discretion. Judge Jackson did not abuse his discretion in this case.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**